Filed 4/29/14  Sahtjian v. Sahtdjian CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MARJORIE SAHATJIAN,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>VICTOR SAHATDJIAN et al.,<br><br>    Defendants and Respondents. | F065113<br><br>(Super. Ct. No. 10CECG03125)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Georgeson, Belardinelli and Noyes, Richard A. Belardinelli, C. Russell Georgeson, and Christopher B. Noyes for Plaintiff and Appellant.

DLA Piper LLP, Todd M. Noonan and W. Scott Cameron for Defendants and Respondents.

-ooOoo-

At one time, appellant Marjorie Sahatjian and her cousins Victor, William, and Margaret Sahatdjian[1] shared ownership of a raisin-processing business, Victor Packing, Inc. (VPI.)  In 2007, Marjorie, who then owned one-third of the shares of VPI, filed a complaint in Madera County Superior Court seeking involuntary dissolution of VPI under Corporations Code section 1800.[2]  Marjorie alleged, among other things, that the other shareholders had received enormous cash distributions from VPI to her detriment.  In response, VPI elected to buy Marjorie's shares and invoked section 2000's procedure for ascertaining the fair value of her shares.  In 2010, VPI paid Marjorie $3,277,000 in exchange for all of her shares in the corporation, and Marjorie dismissed the involuntary-dissolution case.

About two months after that case was dismissed, Marjorie initiated the present case by filing a complaint in Fresno County Superior Court against respondents Victor, William, and Margaret (collectively defendants).  She asserted a claim of breach of fiduciary duty based on defendants' alleged misconduct as majority shareholders in VPI. Specifically, Marjorie alleged that VPI distributed cash to defendants, excluding her from such cash distributions.  The trial court agreed to try defendants' special defenses first and subsequently found in their favor on the affirmative defenses of "Section 2000 Bar," "Res Judicata/Collateral Estoppel," and "Waiver."  These defenses are all based on defendants' position that Marjorie's current claims could have been raised, and were raised, in the prior involuntary-dissolution case.

On appeal, Marjorie contends that the prior case, which involved only valuation of VPI, does not serve to bar her current *personal* claims against defendants, who were not

_____

[1]Because the parties are related and share the same last name or a substantially similar last name, we refer to them and their relatives by their first names to avoid confusion.  No disrespect is intended.

[2]Subsequent statutory references are to the Corporations Code unless otherwise indicated.

parties in the prior case.  Under the circumstances of this case, we disagree and affirm the judgment.

## *FACTS AND PROCEDURAL HISTORY*

### *Background*

Brothers Sarkis and Haig Sahatdjian started a business processing raisins in Madera in 1963.  VPI was incorporated in 1976, with Sarkis's son Victor as president, Haig as secretary, and Sarkis as treasurer.  In the 1970's, Sarkis's children Margaret and William began working for VPI.  Margaret assumed responsibilities for the office and William ran a large dehydrator.  In the 1980's, Haig's children Mary and Steven began working for VPI, assuming clerical and sales support positions.  Haig's daughter Marjorie also began working for VPI, most recently working in its business office.

Over time, Sarkis and Haig transferred all their shares of VPI to their children.  As of 2006, Victor, Margaret, and William each owned one-sixth of VPI's shares, and Steven and Marjorie each owned one-fourth of VPI's shares.[3]  It appears a great deal of discord arose between the cousins and, in May 2007, there were four pending lawsuits in Madera County Superior Court involving VPI, Steven, Marjorie, Victor, Margaret, and William.  On May 8, 2007, the parties mediated their disputes and reached a global settlement, agreeing to dismiss with prejudice all four lawsuits.  As part of the settlement, VPI purchased all of Steven's shares, and the shares were canceled.  This resulted in Marjorie owning one-third of the remaining shares of VPI and Victor, Margaret, and William each owning two-ninths of the shares of VPI.

---

[3]Haig had given his half ownership interest in VPI to his three children, Steven, Mary, and Marjorie.  After Mary died, Steven and Marjorie bought her shares.

3.

*Madera County case*

On November 2, 2007, Marjorie filed a complaint in Madera County Superior Court for involuntary dissolution of VPI under section 1800 (Madera County case). She alleged the majority shareholders—Victor, Margaret, and William—and members of the board of directors had stated their intent to use corporate assets for their own benefit rather than for the benefit of VPI. She alleged that William's salary from VPI was increased to $250,000 per year, but his day-to-day management responsibilities were to manage farming properties and/or operations that benefited persons or entities other than VPI. She alleged that the salary increase was approved without notice to her and without taking into consideration the fact that the "managing majority shareholders/employees have been unable and/or unwilling to generate any profit or dividends payable to the corporate shareholders for at least eight (8) years."

Marjorie further alleged, "The majority shareholders, without Plaintiff's knowledge or consent, have received from the corporation extravagant, enormous cash distributions for some unknown undisclosed financial purposes all to the detriment of Plaintiff." Finally, she alleged the majority shareholders and the members of the board of directors controlled by the majority shareholders "breach[ed] fiduciary obligations owed to corporation and Plaintiff," causing a decrease in the value of VPI, and "liquidation is reasonably necessary to protect the interests of Plaintiff .…"

In response to the involuntary-dissolution proceeding, VPI elected to purchase Marjorie's shares under the buy-out procedure of section 2000. On September 11, 2008, VPI filed a motion for an order staying involuntary dissolution and appointing appraisers to ascertain the value of Marjorie's shares in the Madera County case. On October 29, 2008, the court granted VPI's motion. The court appointed three appraisers to review the records of VPI to determine the fair value of Marjorie's 33 1/3 percent equity interest in the corporation as of November 2, 2007. The valuation date set by the court— November 2, 2007—was the date Marjorie filed her involuntary-dissolution complaint.

4.

On September 14, 2009, Marjorie's attorney, C. Russell Georgeson, wrote an 11-page letter to the three court-appointed appraisers outlining issues relevant to the appraisal from Marjorie's perspective. Among other things, he asserted the appraisers must factor in the "going concern value to determine [the] fair value" of the VPI shares. He also wrote that VPI's financial statements did not reflect the corporation's true profitability because "[e]xisting management has consistently understated actual profits to minimize corporate tax obligations and enable them to deprive [Marjorie] of her pro-rata share of the profits." He urged the appraisers "to consider and include in [their] valuation work an objective assessment of the Company's financial statements with a view towards their normalization and restatement so as to eliminate the effects of the procedures used to understate the Company's profits." One of the "procedures" VPI used to understate profits, according to Georgeson, was the "[p]ayment of compensation to insiders in excess of the fair value of their services." He wrote, "To the extent VPI's profits have been paid out in the form of compensation, such payments constitute *de facto* dividends, which dividends have not been paid *pro rata* with stock ownership as required by the corporation code."

Georgeson further argued the appraisers should use either a later valuation date or some other method to account for the majority shareholders' ongoing misconduct—which was causing Marjorie to continue to lose her share in the profits—from the date she filed the dissolution proceeding until the date VPI actually purchases her shares. He wrote:

> "Valuation Date—Code §2000(f) provides a procedure for setting [an] alternative date of valuation. One of the purposes for this alternative date procedure is to maximize the return to the shareholder, and to prevent any unjust enrichment of the remaining shareholders for profits earned subsequent to the filing date of valuation and the actual date of any buyout.

> "Here, the significance of the alternative date is the passage of time from the filing of this action to the final appraised value of the minority shareholder's shares. *From date of valuation to date of the final report[,] what is to be done with the profits/earning of VPI that should have been allocated to Marjorie Sahatjian but [were] not because no dividends were*

5.

*paid or benefit received by her? This is the primary issue that caused the filing of the involuntary dissolution proceeding. Either an updated value is necessary or some credit must be given to the minority shareholder for VPI's profits/earnings/increase in value in the interim between any valuation date [and] the actual date of a purchase of [Marjorie's] shares.* It is your responsibility to consider the subsequent profits when determining the value of the minority shares, either by updating your valuation from the date of filing or rolling forward the value in some other manner acceptable to the court and the parties." (Italics added.)

The three appraisers produced an appraisal report, which was sent to the Madera County Superior Court on February 15, 2010. They used the original valuation date of November 2, 2007, but in a section of the report titled "Date of Value," addressed Marjorie's position that a subsequent date should have been used to account for her ongoing interest in VPI following her filing for involuntary dissolution. The appraisers explained their belief that the use of a different valuation date would require a different order from the court. The "Date of Value" section of the appraisal reports reads as follows:

"Many events both within and outside a business'[s] control can cause significant changes in its value. A business'[s] value can vary from one date to another due to change in various factors. These changes can occur in, but are not limited to, company management and financial performance, competitive pressures, industry and economic conditions, and investor perceptions. Therefore, the first step in a business appraisal is to determine the precise date of value. The date of value used herein is November 2, 2007, the date stipulated by Court order in this matter, which is the filing date of the Complaint to dissolve the corporation.

"As part of a September 14, 2009 letter (pages 9-10) to the business appraisers, Counsel for the moving party [Marjorie] discussed the procedure in §2000(f) relative to setting an alternative valuation date [¶] ' … to prevent any unjust enrichment of the remaining shareholders for profits earned subsequent to the filing date of valuation and the actual date of any buyout.… It is your responsibility to consider the subsequent profits when determining the value of the minority shares, either by updating your valuation from the date of filing or rolling forward the value in some other manner acceptable to the court and the parties.'

"Relative to this issue, in a September 17, 2009 initial response (prior to September 18, 2009 status conference among the Counsel for the parties and the Court) we responded with the following: [¶] 'We agree that §2000(f) allows for the request of an alternate valuation date. However, we are not the ones authorized to change the valuation date. That is an issue between the parties and the Court. Our job is to value the Company's stock at a point in time. To the extent there is a large lapse in time between the valuation date and the final Court decree, that is an issue for the parties and the Court to address.'

"We went on to encourage the parties to address the valuation date issue among themselves and the Court.

"In an October 20, 2009 meeting among the moving party [Marjorie], the purchasing parties [VPI], both of their Counsels and the business appraisers, the Trahan case [*Trahan v. Trahan* (2002) 99 Cal.App.4th 62 (*Trahan*)] … and its implications were discussed. In the days immediately following this meeting, the Trahan case and its implications to the facts in this case were addressed in emails among the Counsel for both parties and the business appraisers, including the alternate valuation date.

"Since the October 20, 2009 meeting, the impact of the valuation date, particularly related to the valuation of inventory[,] has been discussed on numerous occasions among the [attorneys] for … both the moving and purchasing parties and the business appraisers.

"To our knowledge, no change in the valuation date of November 2, 2009[4] has ever been addressed with the Court."

The appraisers analyzed VPI's financial statements and income tax returns for 2003 through 2007. They addressed Marjorie's concern that VPI's financial statements understated its profits "to deprive [her] of her pro-rata share of the profits" as follows:

"It is our understanding there have been claims made that the financial statements and income tax returns did not properly reflect the complete earnings of the business due to significant personal use of corporate assets and/or misappropriation of corporate funds. There are also claims that related party transactions have not been properly recorded in the accounting

---

[4]This is an obvious typographical error, as the appraisers refer to a valuation date of November 2, 2007, throughout the report.

records. On an historic basis, it has been impracticable to adjust the historical earnings for the alleged misappropriations. In addition, it has been impracticable to verify or disprove the claims pertaining to related party assets and/or liabilities.

"It is our understanding that *the parties to this case have agreed that the magnitude of these issues, if investigated and quantified, would not yield a material asset value to the Company and would not have any material impact on our valuation analysis.*" (Italics added.)

The appraisers estimated the fair value of Marjorie's shares of VPI as of November 2, 2007 to be $3,277,000. Their estimate was premised on an orderly liquidation, defined as a liquidation assuming "the asset or assets are sold over a reasonable period of time to maximize proceeds received."[5]

On March 15, 2010, Marjorie filed an objection to the appraisal report with the court. She objected to the report's determination of the liquidation value of VPI's inventory, which she believed understated the inventory's value. Marjorie did not object to the valuation date of November 2, 2007; she did not object to the appraisers' use of "Orderly Liquidation Value" rather than "Going Concern Value"; and she did not object to the failure to adjust earnings for alleged historic misappropriations. Nor did she raise any objection related to the appraisers' failure to compensate her for VPI's profits generated between the valuation date and the date of buyout. VPI also objected to portions of the appraisal report.

On April 2, 2010, the court confirmed the appraisers' estimate and ordered VPI "and/or its majority shareholders" to pay Marjorie $3,277,000 for her 33 1/3 percent equity interest in VPI within 90 days. The court further ordered that, if payment to

---

[5]The appraisers described two other valuation premises in addition to "Orderly Liquidation Value": "Forced Liquidation Value" assumes assets are sold as quickly as possible (such as at an auction), and "Going Concern Value" assumes the business enterprise will continue to operate and that there is value in intangible elements (e.g., a trained workforce and necessary licenses).

Marjorie was not made before the 90th day, there would be a winding up and dissolution of VPI.

VPI did buy Marjorie's shares within 90 days of the court's order. The record shows that, on June 28, 2010, VPI sent Marjorie a check for $3,277,000, and Marjorie sent her stock certificates to VPI the next day. Marjorie requested dismissal of her involuntary-dissolution action without prejudice, and the court entered the dismissal on July 12, 2010.

### *Current case*

On September 7, 2010, Marjorie filed a complaint against defendants in Fresno County Superior Court. She asserted a claim of breach of fiduciary duty alleging defendants, as majority shareholders, breached their fiduciary duties to her, the minority shareholder of VPI. She alleged defendants controlled VPI "for the purpose of financially enriching themselves at the expense of Plaintiff by engaging in the following conduct: (1) approving and receiving for themselves personally bonuses during 2008, 2009 and 2010[6] to the exclusion of Plaintiff; (2) receiving from Victor Packing Inc. cash distributions for unknown undisclosed financial purposes for Defendants['] benefit and to the exclusion of Plaintiff; (3) allocating to themselves lucrative salary increases, to the detriment and exclusion of Plaintiff; (4) using corporate monies for Defendants['] personal financial gain instead of paying dividends to shareholders, as well as other breaches presently unknown to Plaintiff; (5) adopted a dividend policy or lack thereof designed to serve Defendants['] own personal financial interest, to the expense, damage and detriment of Plaintiff."

---

[6]Marjorie's complaint alleges wrongdoing "[p]rior to July 2010." Her reference to bonuses given 2008 through 2010 suggests she is seeking damages for misconduct that allegedly occurred after she reached a global settlement with her cousins and VPI in May 2007.

9.

Defendants filed an answer asserting numerous affirmative defenses. Their 6th, 7th, and 12th affirmative defenses are relevant to this appeal:

• The sixth affirmative defense alleged, "Plaintiff's claims against Defendants are barred as a result of the involuntary dissolution proceedings instituted by Plaintiff pursuant to Corporations Code sections 1800 and/or 2000 in or about November of 2007 and the subsequent purchase of all of Plaintiff's shares as a result of those proceedings."

• The seventh affirmative defense alleged, "Plaintiff's claims against Defendants are barred by the doctrines of collateral estoppel and/or res judicata based on the November 2007 dissolution and appraisal proceedings instituted by Plaintiff, and all rulings and orders stemming from those proceedings."

• The 12th affirmative defense alleged, "Plaintiff's claims against Defendants are barred by the doctrine of waiver because, among other things, Plaintiff intentionally relinquished any rights stemming from her position as a shareholder of Victor Packing, Inc. by seeking involuntary dissolution under Corporations Code section 1800 in November of 2007 and accepting payment in full for all of her shares of Victor Packing, Inc. in the Section 2000 proceeding."

Trial was set for March 12, 2012. On March 7, 2012, defendants filed a motion requesting the court advance the trial of their special defenses under Code of Civil Procedure section 597.[7] Defendants argued that judicial efficiency and economy would be served if the court tried their 6th, 7th, and 12th affirmative defenses before considering

---

[7]Code of Civil Procedure section 597 provides, in relevant part: "When the answer pleads that the action is barred … by a prior judgment, … or sets up any other defense not involving the merits of the plaintiff's cause of action but constituting a bar …, the court may, either upon its own motion or upon the motion of any party, proceed to the trial of the special defense or defenses before the trial of any other issue in the case …."

the merits of Marjorie's claims. The court agreed to try the special defenses first, set a briefing schedule, and received the parties' documents into evidence.

On March 26, 2012, after hearing arguments from the parties' attorneys, the trial court found for defendants on their special defenses. The court stated, "[A]fter a consideration of all of the arguments and all of the evidence and the other [section] 2000 proceeding, the Court is in agreement with the defendants that the issues were raised[,] were discussed[,] and were satisfied by the [section] 2000 proceeding." The court observed that it made no sense to allow the plaintiff "under different clothing" to seek damages from defendants for breach of fiduciary duty, "which in a sense is the same exact money that was being argued over in [the section] 2000 [proceeding]." There is no indication that anyone requested a statement of decision, and the trial court did not issue one.

Judgment for defendants was entered on April 9, 2012. The judgment provides, "[T]he Court found for Defendants on their Sixth Affirmative Defense (Section 2000 Bar), Seventh Affirmative Defense (Res Judicata/Collateral Estoppel), and Twelfth Affirmative Defense (Waiver) …."

Marjorie filed a notice of appeal on June 4, 2012.

### DISCUSSION

### I.      Standard of review

This is an appeal from a judgment following a court trial on defendants' special defenses. Marjorie, however, does not dispute the facts relevant to the case. The issues presented involve questions of law, which we review de novo. (*Gavin W. v. YMCA of Metropolitan Los Angeles* (2003) 106 Cal.App.4th 662, 669-670 [reviewing de novo trial of special defense where there were no disputed factual issues resolved by trial court]; *Crosby v. HLC Properties, Ltd.* (2014) 223 Cal.App.4th 597, 602 [application of doctrine of res judicata and statutory construction are questions of law reviewed de novo].)

Marjorie asserts the trial court's grant of defendants' motion to advance trial of certain special defenses "resulted in a judgment" and was "'tantamount to a nonsuit,'" and, therefore, the standard of review for a nonsuit should apply. We disagree. Marjorie cites *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27, in which the lower court granted a motion in limine barring all relevant statements on the grounds of the litigation privilege and the parol evidence rule. Observing that the lower court's grant of the motion in limine was the functional equivalent of a nonsuit, the appellate court reviewed the decision applying the standard for granting a nonsuit. (*Id*. at pp. 27-28.) Here, in contrast, the trial court granted a pretrial motion on the order of trial, not a motion on the admissibility of evidence. The result of granting the motion was not a judgment but a court trial on three affirmative defenses. In the resulting trial, the court did not exclude any evidence relevant to Marjorie's position; all evidence offered by the parties was admitted. We see no similarity between the present case and *Edwards* and, consequently, reject Marjorie's assertion that we should review the judgment as though the trial court had granted a nonsuit.

## II. *Involuntary dissolution and buy-out proceedings*

Marjorie contends the trial court erred when it determined that the Madera County case bars her current claims for breach of fiduciary duty against the majority shareholders of VPI. This contention rests on the premise that her current personal claims could not have been adjudicated in the prior proceeding. In order to address Marjorie's contention, we begin with an overview of sections 1800 and 2000, the statutes governing the Madera County case.

### A. *Section 1800*

Section 1800 allows certain shareholders to file a complaint for involuntary dissolution of a corporation on enumerated grounds. As the owner of one-third of VPI's equity, Marjorie was eligible to file a complaint for involuntary dissolution of the corporation. (§ 1800, subd. (a)(2).) Grounds for involuntary dissolution under

12.

section 1800 include: "[t]hose in control of the corporation have been guilty of or have knowingly countenanced persistent and pervasive fraud, mismanagement or abuse of authority or persistent unfairness toward any shareholders or its property is being misapplied or wasted by its directors or officers" and, "[i]n the case of any corporation with 35 or fewer shareholders …, liquidation is reasonably necessary for the protection of the rights or interests of the complaining shareholder or shareholders." (§ 1800, subd. (b)(4), (b)(5).)[8]

These appear to be the grounds of Marjorie's complaint in the Madera County case as she alleged the majority shareholders acted "arbitrarily, fraudulently, and in breach of their fiduciary obligations," and liquidation was "reasonably necessary to protect [her] interests …."

The trial court is granted broad statutory authority to order appropriate relief in a dissolution case. After a hearing on the matter, the trial "court may decree a winding up and dissolution of the corporation if cause therefor is shown or, with or without winding up and dissolution, may make such orders and decrees and issue such injunctions in the case as justice and equity require." (§ 1804.)

### B.  *Section 2000*

Section 2000 provides a procedure for a corporation or its shareholders to avoid involuntary dissolution by buying out the shareholders seeking dissolution.[9]  VPI invoked

---

[8]Other grounds for seeking involuntary dissolution include, for example, the corporation has abandoned its business for more than a year (§ 1800, subd. (b)(1)), or two or more factions of shareholders are so deadlocked that the corporation's business cannot be conducted with advantage to its shareholders (*id.*, subd. (b)(3)).

[9]When shareholders who own 50 percent of a corporation elect to wind up and dissolve the corporation, this is called a "voluntary" dissolution. (§ 1900.) The buy-out procedure of section 2000 may be invoked in response to an action for either voluntary or involuntary dissolution. (§ 2000, subd. (a); see *Mart v. Severson* (2002) 95 Cal.App.4th 521, 524.)

this statute to stay the involuntary-dissolution proceeding and begin the appraisal process so that it could buy Marjorie's interest in the corporation.

"The objective of section 2000 is to provide an alternative to dissolution through a buy-out by the [purchasing parties]. The objective of the statutory appraisal process is to find a fair value for the shares of the parties seeking dissolution and to award the … shareholders seeking dissolution the liquidation value they would have received had their dissolution action been allowed to proceed to a successful conclusion." (*Trahan*, *supra*, 99 Cal.App.4th at p. 75.)

Section 2000 provides, in relevant part:

"(a) Subject to any contrary provision in the articles, in any suit for involuntary dissolution, … the corporation or, if it does not elect to purchase, the holders of 50 percent or more of the voting power of the corporation (the 'purchasing parties') may avoid the dissolution of the corporation and the appointment of any receiver by purchasing for cash the shares owned by the plaintiffs or by the shareholders so initiating the proceeding (the 'moving parties') at their fair value. The fair value shall be determined on the basis of the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation. In fixing the value, the amount of any damages resulting if the initiation of the dissolution is a breach by any moving party or parties of an agreement with the purchasing party or parties may be deducted from the amount payable to such moving party or parties, unless the ground for dissolution is that specified in paragraph (4) of subdivision (b) of Section 1800. The election of the corporation to purchase may be made by the approval of the outstanding shares (Section 152) excluding shares held by the moving parties.

"(b) If the purchasing parties (1) elect to purchase the shares owned by the moving parties, and (2) are unable to agree with the moving parties upon the fair value of such shares, … the court upon application of the purchasing parties, … in the pending action …, shall stay the winding up and dissolution proceeding and shall proceed to ascertain and fix the fair value of the shares owned by the moving parties.

"(c) The court shall appoint three disinterested appraisers to appraise the fair value of the shares owned by the moving parties, and shall make an order referring the matter to the appraisers so appointed for the purpose of

14.

ascertaining such value. The order shall prescribe the time and manner of producing evidence, if evidence is required. The award of the appraisers or of a majority of them, when confirmed by the court, shall be final and conclusive upon all parties. The court shall enter a decree which shall provide in the alternative for winding up and dissolution of the corporation unless payment is made for the shares within the time specified by the decree. If the purchasing parties do not make payment for the shares within the time specified, judgment shall be entered against them … for the amount of the expenses (including attorneys' fees) of the moving parties. Any shareholder aggrieved by the action of the court may appeal therefrom.

"(d) If the purchasing parties desire to prevent the winding up and dissolution, they shall pay to the moving parties the value of their shares ascertained and decreed within the time specified pursuant to this section, or, in case of an appeal, as fixed on appeal. On receiving such payment or the tender thereof, the moving parties shall transfer their shares to the purchasing parties. [¶] … [¶]

"(f) For the purposes of this section, the valuation date shall be (1) in the case of a suit for involuntary dissolution under Section 1800, the date upon which that action was commenced …. However, … the court may, upon the hearing of a motion by any party, and for good cause shown, designate some other date as the valuation date."

Both an action for involuntary dissolution of a corporation under section 1800 and the buy-out procedure under section 2000 have been described as "special proceedings" rather than civil or ordinary "action[s]." (*Go v. Pacific Health Services, Inc.* (2009) 179 Cal.App.4th 522, 532 (*Go*); *Esparza v. Kadam, Inc.* (1960) 182 Cal.App.2d 802, 807; see Code Civ. Proc., §§ 22, 23.) "'Special proceedings being of statutory origin, do not proceed according to the course of the common law but give new rights and afford new remedies.'" (*Esparza*, *supra*, at p. 807.)

When a corporation or its majority shareholders (the purchasing parties) choose to invoke section 2000 to purchase the shares of a shareholder who has initiated an involuntary-dissolution proceeding (the moving party), the moving party no longer needs to prove the merits of her involuntary-dissolution complaint. (*Go*, *supra*, 179 Cal.App.4th at p. 531.) Instead, the section 2000 procedure is a summary proceeding that

"supplants the action for involuntary dissolution" and inevitably results in either the purchasing parties buying out the moving party or the dissolution of the corporation. (*Go, supra,* at p. 530.)

### 1. Valuation date

The valuation date for determining liquidation value is defined as the date on which the involuntary-dissolution action is commenced. (§ 2000, subd. (f).) "Nevertheless, subdivision (f) provides flexibility by giving the court discretion to designate some other date as the valuation date, upon motion of a party and for good cause." (*Trahan*, *supra*, 99 Cal.App.4th at p. 76; § 2000, subd. (f).) In *Trahan*, for example, the Court of Appeal recognized that "the discretion given the court by the express language of subdivision (f) to designate a valuation date other than the date upon which the dissolution proceeding was initiated encompasses the possibility that the court may obtain a *current* appraisal of the fair value of the shares based on a *future* valuation date ...." (*Trahan, supra,* at p. 77, fn. 8, italics added.)

*Trahan* involved a corporation engaged in the business of general contracting and maintenance services. After the moving parties sought voluntary dissolution, the remaining shareholders elected to purchase the moving parties' shares, and the trial court appointed an appraiser to determine the fair value of those shares. The appraiser determined the liquidation value of the corporation as of the valuation date to be *negative* $164,487, and the trial court confirmed the appraiser's determination. (*Trahan*, *supra*, 99 Cal.App.4th at pp. 67-69.) The moving parties appealed, arguing that the determination of the fair value of their shares was erroneous because "the appraiser refused to include in her valuation of the corporation certain existing but uncompleted contracts, which according to the appraiser would bring the corporation estimated *future* gross profits of more than $650,000." (*Id*. at p. 66, italics added.)

The Court of Appeal pointed out that the moving parties "never requested that the trial court exercise its discretion to defer the valuation date to allow the backlog of

construction and maintenance contracts to be completed" and thus could not challenge the valuation date set by the trial court. (*Trahan*, *supra*, 99 Cal.App.4th at p. 71.) The moving parties argued, however, that an actual dissolution of the corporation would have allowed for a winding-up period, during which the outstanding contracts could have been completed. (*Id*. at p. 72.) The Court of Appeal acknowledged there was a "seeming contradiction" between the objective of section 2000, which is to award the moving parties what they would have received had their involuntary-dissolution action been allowed to proceed, and the language of section 2000, which defines the fair value of the moving parties' shares as the liquidation value as of the valuation date. The court reasoned, however, that this apparent contradiction could be avoided by setting a deferred valuation date so that the liquidation value determined by the appraisers would take into account the profits and losses associated with a hypothetical winding-up period prior to the dissolution of the corporation. (*Trahan, supra,* at pp. 75-76.) Thus, the moving parties in *Trahan* "could have requested the court to set the valuation date to allow for a hypothetical [winding-up] period, during which the unperformed contracts would be completed and the profits realized." (*Id*. at p. 76.) The court continued, "Such request would appear particularly appropriate in the case of service corporations, whose main assets are contracts to be performed in the future." (*Id*. at pp. 76-77.)

The court further observed that the valuation date could have been set at a hypothetical future date falling *after* the conclusion of the buy-out:

> "Had the court set a deferred valuation date upon appellants' request and a showing of good cause therefor, the parties still could have engaged in and concluded the section 2000 process promptly. The appraisal and the actual purchase of appellants' shares could have occurred in the section 2000 proceeding, well before the valuation date. The liquidation value of the assets could have been determined based upon the appraiser's projection as to what that value would be on the valuation date, after performance of the contracts. Upon court confirmation of the appraisal, respondents could immediately purchase appellants' shares for their designated fair value or could choose to allow the dissolution to proceed." (*Trahan*, *supra*, 99 Cal.App.4th at p. 77.)

17.

Since the moving parties in *Trahan* had not requested a deferred valuation date to account for completing existing contracts, the Court of Appeal could not grant them relief from the trial court's decree.  (*Trahan*, *supra*, 99 Cal.App.4th at p. 78.)

### 2. *Value of pending litigation included in liquidation value*

The fair value of the moving party's shares are "determined on the basis of the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation."  (§ 2000, subd. (a).)  Pending litigation involving the corporation may be included in the appraisers' determination of liquidation value.  For example, in *Brown v. Allied Corrugated Box Co.* (1979) 91 Cal.App.3d 477, 482, the appraisers included an evaluation of the corporation's potential liability in a pending wrongful-death action.  The appraisers reduced the corporation's value by $65,000 to account for that potential *liability*.  (*Id.* at p. 484.)  Similarly, where a derivative claim on behalf of a corporation is pending, the claim is viewed as an *asset* of the corporation and may be valued in the appraisal process.  (*Cotton v. Expo Power Systems, Inc.* (2009) 170 Cal.App.4th 1371, 1380-1381 (*Cotton*).)

In *Cotton*, the minority shareholder of Expo Power Systems, Inc., Ken Cotton, filed a direct-personal-shareholder complaint for involuntary dissolution of the corporation alleging breach of fiduciary duty by the majority shareholders.  Cotton also filed a separate derivative action against the majority shareholders alleging breach of fiduciary duty.  In the dissolution proceeding, the majority shareholders elected to buy Cotton's shares under section 2000.  The appraisers prepared an appraisal report in which they expressly declined to value Cotton's derivative claims.  (*Cotton*, *supra*, 170 Cal.App.4th at p. 1377.)  The trial court confirmed the appraisers' determination of the fair value of Cotton's shares, exclusive of the value of the derivative action, and allowed the derivative action to continue to be litigated by deferring the purchase date to 10 days after the entry of final judgment in the derivative action.  (*Id.* at p. 1379.)

18.

On appeal by the majority shareholders, the Court of Appeal reversed the trial court's order. The appellate court concluded that the trial court's order could not be affirmed "because the appraisal did not take into account the effect of the derivative action and was therefore incomplete as a matter of law, and the trial court's attempt to remedy this defect through a deferral of the buyout date until after the entry of judgment in the derivative action was contrary to the summary nature of the buyout proceeding." (*Cotton*, *supra*, 170 Cal.App.4th at p. 1380.) The court noted that the majority shareholders expected the derivative claims to be appraised and accounted for in the section 2000 proceeding, and the appraisers had acknowledged that they could assess the merits and value of the claims. (*Cotton, supra,* at p. 1381.) On remand, the trial court was directed to obtain an appraisal taking into account the effect of the pending litigation on the fair value of the corporation or, in the alternative, to allow the parties to litigate that issue before the court. (*Id*. at p. 1383.)

In sum, claims made against the corporation and claims brought on behalf of the corporation may be accounted for in the appraisal process.

### III. *Marjorie's current claims are barred because she could have litigated the claims in the Madera County case*

The trial court found in favor of defendants on their affirmative defenses of "Section 2000 Bar," "Res Judicata/Collateral Estoppel," and "Waiver." As we will explain, we agree that Marjorie's current claims are barred under the doctrine of res judicata. We need not decide whether the claims are also barred because of waiver or "Section 2000 Bar." (*In re Sutter Health Uninsured Pricing Cases* (2009) 171 Cal.App.4th 495, 513 ["one good reason is sufficient to sustain the order from which the appeal was taken"].)

#### A. *Overview of doctrine of res judicata*

"'The doctrine of res judicata rests upon the ground that the party to be affected, or some other with whom he is in privity, has litigated, *or had an opportunity to litigate* the

same matter in a former action in a court of competent jurisdiction, and should not be permitted to litigate it again to the harassment and vexation of his opponent. Public policy and the interest of litigants alike require that there be an end to litigation.' [Citation.]" (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1065, italics added.) "A clear and predictable res judicata doctrine promotes judicial economy. Under this doctrine, all claims based on the same cause of action must be decided in a single suit; if not brought initially, they may not be raised at a later date. '"Res judicata precludes piecemeal litigation by splitting a single cause of action or relitigation of the same cause of action on a different legal theory or for different relief."' [Citation.] A predictable doctrine of res judicata benefits both the parties and the courts because it 'seeks to curtail multiple litigation causing vexation and expense to the *parties* and wasted effort and expense in *judicial administration*.' [Citation.]" (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 897.)

"Res judicata bars a cause of action that was *or could have been litigated* in a prior proceeding if '(1) the present action is on the same cause of action as the prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the parties in the present action or parties in privity with them were parties to the prior proceeding. [Citation.]' [Citation.]" (*Federal Home Loan Bank of San Francisco v. Countrywide Financial Corp.* (2013) 214 Cal.App.4th 1520, 1527, italics added.)

"In California, a 'cause of action' is defined by the 'primary right' theory. 'The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action.' [Citation.]" (*Amin v. Khazindar* (2003) 112 Cal.App.4th 582, 589.) "[T]he primary right is simply the plaintiff's right to be free from the particular injury suffered. [Citation.] It must therefore be distinguished from the *legal theory* on which liability for that injury is premised: 'Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief.' [Citation.] The primary right must also

be distinguished from the *remedy* sought: 'The violation of one primary right constitutes a single cause of action, though it may entitle the injured party to many forms of relief, and the relief is not to be confounded with the cause of action, one not being determinative of the other.' [Citation.]" (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681-682.)

The doctrine of res judicata applies to special proceedings in the same way it applies to ordinary actions. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1205.)

### B.    Analysis

In the Madera County case, Marjorie sought involuntary dissolution of VPI based on alleged shareholder misconduct. She alleged VPI made "extravagant, enormous cash distributions" to the majority shareholders, causing a decrease in the value of the corporation and harm to her. After VPI elected to buy her shares and appraisers were appointed, Marjorie explained to the appraisers that the misconduct at VPI involved paying excessive salaries to the majority shareholders, and "such payments constitute *de facto* dividends, which dividends have not been paid *pro rata* with stock ownership as required by the corporation code." In addition, she asserted that the misconduct was ongoing and, as a result, she continued to lose out on her share of VPI's profits.

Marjorie's current case asserting breach of fiduciary duty is based on the same alleged misconduct. Specifically, Marjorie alleges that VPI paid the majority shareholders bonuses and "lucrative salary increases" and "us[ed] corporate monies for [the majority shareholders'] personal financial gain instead of paying dividends .…" The alleged injury to Marjorie is also the same in both cases, which defendants aptly describe as "deprivation of the full value of [Marjorie's] VPI share ownership in the form of her alleged share of its profits." Accordingly, we conclude the current case involves the same primary right, and thus the same cause of action, raised in the Madera County case.

21.

Further, for alleged continuing injury incurred from the time she initiated the Madera County case until she was bought out, Marjorie *could have* litigated her current claims in the Madera County case by requesting that the trial court order a deferred valuation date. (*Trahan*, *supra*, 99 Cal.App.4th at p. 77.) Had she sought a deferred valuation date from the court, the appraisers could have evaluated her allegations that the majority shareholders were receiving excessive compensation and wrongful "cash distributions" on an ongoing basis. To the extent the appraisers found compensation excessive and other cash distributions wrongful or unauthorized, they could have treated that amount as an asset of VPI, increasing the liquidation value of Marjorie's shares in VPI. Indeed, Marjorie told the appraisers to defer the valuation date to take into account the majority shareholders' alleged continuing wrongdoing.

Alternatively, Marjorie could have brought a derivative action on behalf of VPI during the appraisal process "to recover assets for the corporation or to prevent the dissipation of its assets" by seeking the return of alleged excessive compensation, bonuses, and cash distributions and an end to the alleged practice of distributing VPI profits to the majority shareholders. (See *Sutter v. General Petroleum Corp.* (1946) 28 Cal.2d 525, 530.) This derivative action could have been litigated in the appraisal process (that is, the merit of the claim could have been assessed to determine its value) and included in the liquidation value of Marjorie's interest in VPI. (*Cotton*, *supra*, 170 Cal.App.4th at p. 1383.)

Here, the appraisers recognized their obligation to value pending litigation involving VPI in the appraisal process and cited *Cotton*, *supra*, 170 Cal.App.4th 1371, in their appraisal report. In fact, they viewed Marjorie's allegations of wrongdoing contained in her complaint for involuntary dissolution to be a form of derivative action and potentially subject to appraisal as an asset of VPI. Marjorie, however, indicated to the appraisers that her involuntary-dissolution complaint need not be appraised as an asset of the corporation. The appraisers wrote:

22.

"In an October 20, 2009 meeting among the moving party, the purchasing parties, both of their Counsels and the business appraisers, this specific issue [valuation of Marjorie's allegations in the dissolution complaint] was discussed. Counsel for the moving party [Marjorie], with no objection from Counsel for the purchasing party [VPI], indicated there should be no value associated with the underlying §1800 action in this case, as it related to the §2000 valuation. This decision was in part the result of a May 8, 2007 settlement agreement among the parties such that the derivative action would have related to only events from May 8, 2007 to November 2, 2007."

The appraisers went on to note that they were not aware of any other pending litigation that would impact the value of the company.

Moving to the next step of the res judicata analysis, we see that the prior proceeding resulted in a final judgment on the merits. There was a judgment on the merits in the Madera County case. The trial court ordered VPI to buy Marjorie's shares in the corporation for the sum of $3,277,000. This was the liquidation value of her interest in VPI, which could have encompassed the value of her current claims if she had asked the court to defer the valuation date or brought a derivative action during the pendency of the section 2000 proceeding.

Finally, we agree with defendants that they are entitled to raise the defense of res judicata against Marjorie. "The doctrine of res judicata is applicable where the identical issue was decided in a prior case by a final judgment on the merits and the party *against whom the plea is asserted* was a party or in privity with a party to the prior adjudication." (*French v. Rishell* (1953) 40 Cal.2d 477, 479, italics added.) Here, Marjorie was a party in the Madera County case and is the party against whom res judicata is being asserted in this case. Also, since defendants were the alleged wrongdoers in the Madera County case and were the majority shareholders of VPI, there is substantial identity between defendants and VPI. (See *Wilson v. Ostly* (1959) 173 Cal.App.2d 78, 82 [applying res judicata where there is "substantial identity of parties"]; 7 Witkin, Cal. Procedure (5th ed. 2008) Judgment, § 452, p. 1108.)

For the foregoing reasons, we conclude Marjorie's current claims are barred under the doctrine of res judicata. Marjorie's attempts to avoid this result are not persuasive.

### C.    Marjorie's challenges to the trial court's judgment

Primarily, Marjorie contends she did not and could not litigate her current claims in the Madera County case. She relies on the section of the appraisal report in which the appraisers discussed Georgeson's claim that VPI's financial statements understated profits. The appraisers wrote:

> "It is our understanding there have been claims made that the financial statements and income tax returns did not properly reflect the complete earnings of the business due to significant personal use of corporate assets and/or misappropriation of corporate funds. There are also claims that related party transactions have not been properly recorded in the accounting records. On an historic basis, it has been impracticable to adjust the historical earnings for the alleged misappropriations. In addition, it has been impracticable to verify or disprove the claims pertaining to related party assets and/or liabilities.

> "It is our understanding that the parties to this case have agreed that the magnitude of these issues, if investigated and quantified, would not yield a material asset value to the Company and would not have any material impact on our valuation analysis."

Marjorie claims this shows the appraisers "would not consider the misappropriation issues no matter what valuation date" was used. She also claims the appraisers determined that her allegations of wrongdoing by the majority shareholders "were irrelevant to valuing VPI." We disagree with Marjorie's reading of the above passage. The appraisers wrote that it was their understanding the parties agreed that the issue of misappropriation (by overcompensation, cash distributions, etc.) was not a material asset to VPI. Specifically, the parties agreed that, if Marjorie's misappropriation claim were to be investigated and quantified, it would not yield a material asset to VPI. As a consequence, there was no reason for the appraisers to expend resources and efforts to appraise the claim. The appraisers did not suggest they were unwilling to investigate and quantify Marjorie's claim; they simply understood that *the parties believed valuation*

24.

*was not necessary*. The appraisers also demonstrated a willingness to evaluate Marjorie's allegations as a derivative claim with potential value to VPI. Again, however, Marjorie indicated that an appraisal of her allegations was not necessary. Her counsel "indicated there should be no value associated with the underlying §1800 action in this case, as it related to the §2000 valuation." Marjorie cannot fault the appraisers for relying on the *parties'* representation that her claims "would not yield a material asset value ...."

With respect to the valuation date, the appraisers explained that they were not authorized to use a different valuation date without a court order. They were correct. Section 2000, subdivision (f), provides that the valuation date is the date the action was commenced, but it also authorizes the court (not the court-appointed appraisers) to designate some other date as the valuation date for good cause. While Marjorie asked the appraisers to change the valuation date, she never asked the trial court to defer the valuation date to account for her alleged ongoing loss of profits. The appraisers did not suggest that they would not evaluate Marjorie's allegations if the valuation date were deferred. To the contrary, the appraisers discussed the implications of *Trahan*, *supra*, 99 Cal.App.4th 62, with the parties and encouraged them to address the valuation date with the court.

Moreover, even if the appraisers had refused to consider Marjorie's claim of ongoing misappropriation, Marjorie should have raised the issue and objected to the appraisal with the trial court. (Cf. *Cotton*, *supra*, 170 Cal.App.4th at p. 1380 [recognizing that appraisal that did not take into account value of pending derivative action was incomplete and could not be confirmed by trial court].) As the defendants argue, Marjorie was aware of section 2000, subdivision (f), and *Trahan*, but she "nonetheless elected, for her own tactical reasons, not to challenge the Report when the appraisers advised her that they could not use a different valuation date ...."

Marjorie also repeats throughout her appellate brief that her current claims are direct and personal claims against the majority shareholders, not derivative claims on

behalf of VPI. But this does not change the fact that she could have been compensated for the same alleged injury in the Madera County case by use of a deferred valuation date. Furthermore, the allegations in her current case could have supported a derivative action as well. "A shareholder's derivative suit seeks to recover for the benefit of the corporation and its whole body of shareholders when injury is caused to the corporation that may not otherwise be redressed because of failure of the corporation to act." (*Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 106 (*Jones*).) An action is derivative if "'it seeks to recover assets for the corporation or to prevent the dissipation of its assets.'" (*Ibid.*) Here, Marjorie alleges the majority shareholders used corporate monies for personal gain. She could have brought a derivative action against defendants for recovery of corporate monies.

Marjorie appears to argue that her current claims could not have been raised in a derivative action. She relies on *Jara v. Suprema Meats, Inc.* (2004) 121 Cal.App.4th 1238. In that case, the plaintiff owned 30 percent of the shares of a corporation and the remaining two shareholders each owned 35 percent. (*Id.* at p. 1245.) Among other claims, the plaintiff sued the two other shareholders (together they were the majority shareholders) for breach of fiduciary duty "by paying themselves excessive compensation and denying [plaintiff] a fair share of the corporate profits." (*Id.* at p. 1242.) The trial court effectively dismissed this claim on the ground that it could only be asserted in a derivative action, and the plaintiff appealed. (*Id.* at p. 1252.) The Court of Appeal reversed, holding that the plaintiff was not *barred* from bringing an individual action under the circumstances of the case. The court noted that the policy justifications for requiring a derivative action rather than an individual-shareholder action are to prevent a multiplicity of lawsuits by individual shareholders and to prevent preferential treatment for the more diligent shareholders. Such concerns were not present in *Jara* because the plaintiff was the only minority shareholder. (*Id.* at p. 1259.) We do not read *Jara* as holding that allegations of excessive compensation could *not* be raised in a derivative

26.

action. Rather, we read the case as holding that, where there are no policy justifications for *requiring* a derivative action, a claim that would ordinarily be brought as a derivative action *may* be raised as an individual shareholder's direct claim. It has been observed, "the distinction between direct and derivative actions sometimes blurs, especially in corporations with only a few shareholders where the acts of one officer/shareholder directly impacts both the corporation *and* the *other shareholders*. Consequently, courts have permitted a *direct* shareholder action, or given direct shareholder *recovery* in a *derivative* action, when it was equitable to do so." (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2007) ¶ 6:598.2, p. 6-127, citing *Jara*, *supra*; see also, Friedman, *supra*, ¶ 6:601b, at p. 6-129 ["Excessive officer compensation is a classic example of a *corporate* harm that should ordinarily be remedied through a *derivative* action."].) Accordingly, we reject Marjorie's position that her current claims could not have been brought as a derivative action.

We also reject Marjorie's contention that her current case does not involve the same claims or parties that were involved in the Madera County case. In the res judicata analysis, it is not the legal theory used or remedy sought that matters; it is whether the primary right is the same in the prior proceeding. (*Crowley v. Katleman*, *supra*, 8 Cal.4th at pp. 681-682.) As we have discussed, the current case involves the same primary right raised in the Madera County case even if the legal theories and damages sought are different. The relevant party is Marjorie since she is the one against whom the res judicata defense is being asserted, and she is the plaintiff in both cases. (*French v. Rishell*, *supra*, 40 Cal.2d at p. 479.) *Topanga Corp. v. Gentile* (1963) 219 Cal.App.2d 274, cited by Marjorie, is not relevant to her situation. In that case, there was a prior action brought by shareholders of a corporation against the Gentiles, which resulted in a judgment. (*Id*. at p. 277.) When the corporation itself sued the Gentiles, it conceded that the issues were the same as those decided in the prior action but argued it was not subject to res judicata because it was neither a party nor in privity with a party in the prior action.

27.

The Court of Appeal agreed. (*Id*. at pp. 278-279.) This case does not apply to Marjorie, who is the same party in the Madera County case and the present case.[10]

Marjorie makes various arguments about the purpose and limits of section 2000. She asserts that section 2000 "is not an 'all inclusive' procedure enacted for the purpose of resolving all claims arising in the corporate setting." She continues, "The statute does not expressly or impliedly authorize the consideration or adjudication of a shareholder's *direct, personal* causes of action against other shareholders that are not relevant to corporate valuation issues authorized by the statute." We need not address the broad issue of whether a section 2000 proceeding necessarily bars *any* subsequent claim arising in the corporate setting. This is because we reject the premise of her next statement—that the primary right involved in her current claims was not relevant to corporate valuation issues. As we have explained, Marjorie could have litigated her current claims (the right not to be deprived of her share of VPI's profits) in the Madera County case either by asking for a deferred valuation date or by raising a derivative claim on behalf of VPI. In either event, the injury for which Marjorie seeks redress in her current case would have

---

[10]Marjorie also cites *Denevi v. LGCC* (2004) 121 Cal.App.4th 1211 and misquotes the court. She writes that the Court of Appeal "held 'a single cause of action by a majority shareholder might give rise to derivative claims, individual claims, or *both*.'" The court actually wrote, in describing the Supreme Court's decision in *Jones, supra,* 1 Cal.3d 93, "The Supreme Court reversed, noting that a single *course* of action by a majority shareholder might give rise to derivative claims, individual claims, *or both*." (*Denevi*, *supra*, at p. 1222, first italics added.) Marjorie's misquote of the court's language is misleading. A single "course of conduct" may well cause different injuries to different plaintiffs, leading to different causes of action. A single "cause of action," however, may not be brought serially by a single plaintiff under different theories. Further, the court's discussion of its understanding of *Jones* is dicta, as the *Denevi* plaintiff's individual claim against the defendants was for defrauding him into transferring purchase rights to the corporation. The plaintiff's claim was not based on his status as shareholder and was "unique … to him" (i.e., the corporation could not bring the same claim). (*Ibid.*) Again, this case does not apply to Marjorie, who had one primary right involved in her Madera County case (including any derivative action that could have been appraised) and her current case.

been accounted for in the valuation of the corporation and, thus, would have been "relevant to corporate valuation issues .…"

Marjorie also raises arguments based on the language of section 2000 that are unavailing. Marjorie asserts that the title of section 2000—"Avoidance of dissolution by purchase of plaintiffs' shares; *valuation*; vote required; stay of dissolution proceedings; appraisal under court order; confirmation by court; appeal" (italics added)—demonstrates that the statute "is exclusively related to one subject, namely, providing a summary procedure to avoid dissolution of a corporation and nothing more." Because we conclude Marjorie's current claims could have been relevant to corporation valuation, this argument does not help Marjorie.

Next, she cites the language of section 2000, subdivision (a), which provides in pertinent part:

> "In fixing the [fair] value, the amount of any damages resulting if the initiation of the dissolution is a breach *by any moving party or parties* of an agreement with the purchasing party or parties may be deducted from the amount payable to such moving party or parties, unless the ground for dissolution is that specified in paragraph (4) of subdivision (b) of Section 1800."[11]  (Italics added.)

The 1975 Legislative Committee Comments—Assembly [Corrected] to section 2000 explain: "The purpose of this provision is to eliminate multiple litigation with respect to related issues. However, where the ground for involuntary dissolution is any one of the acts of wrongdoing specified in subdivision (b)(4) of Section 1800, the breach of any agreement may not be considered in determining the fair value of the shares." (Legislative Com. com., 23E West's Ann. Corp. Code (1990 ed.) foll. § 2000, p. 517.)

---

[11]Section 1800, subdivision (b), lists grounds for involuntary dissolution. Paragraph (4) provides, "Those in control of the corporation have been guilty of or have knowingly countenanced persistent and pervasive fraud, mismanagement or abuse of authority or persistent unfairness toward any shareholders or its property is being misapplied or wasted by its directors or officers."

Marjorie argues:

"Because the sole grounds for Appellant's Dissolution Action against VPI were those set forth in §1800(b)(4), consideration of such claims as offsets is specifically excluded from consideration in a §2000 proceeding.… [¶] …[¶] The limitations in this provision reflect the Legislature's intent to prohibit appraisers' consideration of shareholder damage claims based upon conduct described in §1800(b)(4) in any circumstances. There are sound reasons for such limitations because addressing such shareholder claims in the special proceeding would expand §2000 to include 'multiple litigation' issues between shareholders far beyond the intended purpose of §2000. (See Legislative Comment to 2000.)"

Marjorie misunderstands the statute. The provision allowing for an offset allows the appraisers and the court to take into account the fact that the moving party's dissolution action is a breach of agreement. This means, for example, if a 50 percent shareholder of a corporation (moving party) initiates a voluntary dissolution proceeding *and the initiation of the proceeding itself is a breach of an agreement with the corporation or other shareholders*, then the purchasing party (either the corporation or the other 50 percent shareholder or shareholders) may seek an offset for the damages caused by the moving party's breach. The purpose of eliminating multiple litigation is served *by allowing an offset* because the purchasing party need not initiate a second lawsuit against the moving party in order to recover damages for the moving party's breach.

The limitation on the offset comes into play if a shareholder initiates an involuntary-dissolution action because of the wrongful conduct of those in control of the corporation as described in section 1800, subdivision (b)(4). If a moving party seeks dissolution of a corporation because of pervasive fraud or unfairness, then the purchasing parties are not entitled to any offset even if they claim the moving party's initiation of dissolution proceedings was a breach of agreement.

The offset and the limitation, however, related only to (1) a claim of breach of agreement based on the initiation of the dissolution action that is (2) made by the purchasing party against the moving party. This part of section 2000, subdivision (a),

does not apply to claims other than breach-of-agreement claims and does not apply to any claims made by the moving party against the purchasing party. Marjorie's position that this statutory language means appraisers are *prohibited* from considering a moving party's claims that are based on misconduct described in section 1800, subdivision (b)(4), is simply incorrect.

Marjorie notes that a section 2000 appraisal is a special proceeding that is summary in nature and does not provide for a full evidentiary hearing. (*Abrams v. Abrams-Rubaloff & Associates, Inc.* (1980) 114 Cal.App.3d 240, 247-248.) From this observation, she claims, "Thus, any resolution of Appellant's *personal* claims in the appraisal proceeding was not consistent with due process requirements and in violation of Constitutional safeguards." She cites no authority for this assertion, and we are not aware of any. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (*Mathews v. Eldridge* (1976) 424 U.S. 319, 333.) Here, Marjorie had the opportunity to request a deferred valuation date from the trial court, but she chose not to do so. She had the opportunity to discuss her position on valuation with the appraisers as demonstrated by Georgeson's letter of September 14, 2009, and the appraisers' response. She had the opportunity to bring a derivative action, which the court would have been required to consider in setting liquidation value of VPI. (*Cotton*, *supra*, 170 Cal.App.4th at p. 1383.) She had the opportunity to raise objections to the appraisal report with the trial court. She did, in fact, object to the appraisal report but not on the ground that it failed to include the value of her lost profits. In sum, Marjorie had the opportunity to be heard in the Madera County case.

Marjorie also raises concerns about *defendants'* due process rights, pointing out that they were not parties to the Madera County case, and "consideration of their wrongdoing in their absence would also constitute a violation of their due process rights and provide no remedy against [defendants] who would then have a basis to contest the award of the appraisers on due process grounds." But if Marjorie's current claims had

31.

been valued, either by a deferred valuation date or a derivative action, the value of Marjorie's share of defendants' alleged misappropriations would have been reflected in the fair value of her shares. It would *not* have resulted in a money judgment against defendants. (Cf. *In re FairWageLaw* (2009) 176 Cal.App.4th 279, 286 [where shareholder was not party to voluntary dissolution proceeding, court violated shareholder's right to due process by entering judgment against him in dissolution proceeding].) Further, VPI, not defendants, would have paid Marjorie the value of her current claims as reflected in the fair value of her shares.[12]

## *DISPOSITION*

The judgment is affirmed. Costs are awarded to respondents.

---

[12]In the alternative, if VPI declined to pay the court-ordered fair value of Marjorie's shares, the alternative decree providing for winding up and dissolution of VPI would have become the court's order. (§ 2000, subd. (c).) In that event, the court would have authority to make orders bringing in new parties "as the court deems proper for the determination of all questions and matters." (§ 1806, subds. (c) & (*l*).) The court could join defendants in the dissolution proceeding, determine whether they received wrongful cash distributions from VPI, and if so, enter an order to recover the corporation's assets from them. (See *Howard v. Data Storage Associates, Inc.* (1981) 125 Cal.App.3d 689, 697 [where minority shareholders are unable to proceed on their judgment against asset-stripped corporation in involuntary-dissolution proceeding and directors are necessary parties, trial court erred in failing to join them].) Of course, if defendants were parties in the involuntary-dissolution proceeding, there would be no due process problem.

_____

LaPorte, J.[*]

WE CONCUR:

_____

Levy, Acting P.J.

_____

Detjen, J.

_____

[*]Judge of the Superior Court of Kings County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.