[No. A095792. First Dist., Div. Two. June 7, 2002.]

PATRICK TRAHAN et al., Plaintiffs and Respondents, v.
JEFFREY TRAHAN et al., Defendants and Appellants.

## COUNSEL

Hanson, Bridgett, Marcus, Vlahos & Rudy, James D. Holden, Jacquelyn J. Garman and Lina R. Guillen for Defendants and Appellants.

Peter J. Bassing for Plaintiff and Respondents.

## OPINION

### KLINE, P. J.—

#### INTRODUCTION

Appellants-moving parties Jeffrey and David Trahan and respondents-purchasing parties Patrick and Timothy Trahan are the sole shareholders of Trahan Bros., Inc., a closely held corporation. Appellants together own 50 percent of the shares, as do respondents. Appellants sought to dissolve the corporation and respondents thereafter exercised their statutory right under Corporations Code[1] section 2000 to prevent dissolution by electing to purchase appellants' shares at the statutorily mandated fair value. Appellants appeal from a decree of the Marin County Superior Court confirming the appraiser's award and providing that Trahan Bros., Inc. will be dissolved unless the corporation and/or respondents purchase appellants' share in the corporation for a sum equal to or greater than that determined by the award of the appraiser, in this case *negative* $82,243.50. Appellants argue that the

---

[1]Unless otherwise indicated, all statutory references are to the Corporations Code.

superior court's confirmation of the appraiser's determination of the fair value of their Trahan Bros., Inc., shares was erroneous as a matter of law where the appraiser refused to include in her valuation of the corporation certain existing but uncompleted contracts, which according to the appraiser would bring the corporation estimated future gross profits of more than $650,000.

## Section 2000

This appeal is from a special proceeding conducted pursuant to section 2000 and is expressly authorized by that statute. (§ 2000, subd. (c).) We begin with the statute, which provides in pertinent part:

"(a) . . . [I]n any proceeding for voluntary dissolution initiated by the vote of shareholders representing only 50 percent of the voting power, the corporation or, if it does not elect to purchase, the holders of 50 percent or more of the voting power of the corporation (the 'purchasing parties') may avoid the dissolution of the corporation and the appointment of any receiver by purchasing for cash the shares owned . . . by the shareholders so initiating the proceeding (the 'moving parties') at their fair value. *The fair value shall be determined on the basis of the liquidation value as of the valuation date* but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation. . . .

"(b) If the purchasing parties (1) elect to purchase shares owned by the moving parties, and (2) are unable to agree with the moving parties upon the fair value of such shares, and (3) give bond with sufficient security to pay the estimated reasonable expenses (including attorneys' fees) of the moving parties if such expenses are recoverable under subdivision (c), the court upon application of the purchasing parties, either in the pending action or in a proceeding initiated . . . by the purchasing parties in the case of a voluntary election to wind up and dissolve, shall stay the winding up and dissolution proceeding and shall proceed to ascertain and fix the fair value of the shares owned by the moving parties.

"(c) The court shall appoint three disinterested appraisers to appraise the fair value of the shares owned by the moving parties, and shall make an order referring the matter to the appraisers so appointed for the purpose of ascertaining such value. The order shall prescribe the time and manner of producing evidence, if evidence is required. The award of the appraisers or of a majority of them, when confirmed by the court, shall be final and conclusive upon all parties. The court shall enter a decree which shall provide in the alternative for winding up and dissolution of the corporation

unless payment is made for the shares within the time specified by the decree. If the purchasing parties do not make payment for the shares within the time specified, judgment shall be entered against them and the surety or sureties on the bond for the amount of the expenses (including attorneys' fees) of the moving parties. Any shareholder aggrieved by the action of the court may appeal therefrom.

"(d) If the purchasing parties desire to prevent the winding up and dissolution, they shall pay to the moving parties the value of their shares ascertained and decreed within the time specified pursuant to this section, or, in the case of an appeal, as fixed on appeal . . . . [¶] . . . [¶]

"(f) For the purposes of this section, the *valuation date shall be* . . . (2) in the case of a proceeding for voluntary dissolution initiated by the vote of shareholders representing only 50 percent of the voting power, *the date upon which that proceeding was initiated.* However, . . . the court may, upon the hearing of a motion by any party, and for good cause shown, designate some other date as the valuation date." (Italics added.)

## FACTS AND PROCEDURAL BACKGROUND

Trahan Bros., Inc., is engaged in the business of providing sheet metal and general contracting and maintenance services.

On May 30, 2000, appellants and moving parties executed an "Election to Wind Up and Dissolve Trahan Bros., Inc. By Written Consent of Shareholders Holding Shares Representing 50% of the Voting Power," as authorized by section 1900, subdivision (a).

As of that date, the corporation had a backlog of outstanding construction contracts.

In response to appellants' election to dissolve the corporation, respondents exercised their statutory right to avoid dissolution by purchasing for cash the shares owned by appellants at their fair value. On June 27, 2000, after the parties had failed to agree upon the fair value of appellants' shares, respondents petitioned the superior court to stay dissolution of the corporation and to fix the value of appellants' shares as prescribed by section 2000. On September 19, 2000, following a show cause hearing, the court issued its order staying the winding up and dissolution of the corporation and ordered "the fair value, as of May 30, 2000 ('the valuation date'), of the shares of the stock of the corporation owned by [appellants-moving parties] be determined as follows: [¶] (a) the term 'fair value' as provided in Corporations Code

Section 2000, shall be determined on the basis of the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation." The court further ordered that the appraisal be made by a single appraiser, S.J. Gallina & Co. LLP, certified public accountants, consistent with the parties' agreement. The court also ordered the parties to provide the appraiser with, among other information, "copies of all books and records of the corporation which reflect assets and liabilities of the corporation as of the valuation date, including but not limited to contracts standing in the name of the corporation and not paid in full as of the valuation date . . . ."

The appraiser, Teresa Arrighi-Campbell, working for S.J. Gallina & Co. LLP, filed her report on December 7, 2000. In summary fashion, the report stated the fair value of the corporation was determined on the basis of the liquidation value as of the valuation date, May 30, 2000, and that the "Appraiser has determined the fair value of the corporation, as of the valuation date, to have been $(164,487)." Appellants' shares correspondingly had a combined "fair value" of negative $82,243 (negative $57,570 for Jeffrey Trahan's 35 percent ownership and negative $24,673 for David Trahan's 15 percent ownership).

Respondents-purchasing shareholders thereafter submitted two cashier's checks, one payable to appellant Jeffrey Trahan in the sum of $35 and the other payable to appellant David Trahan in the sum of $15, intending the checks to represent consideration for the transfer of 50 percent of the voting shares in the corporation.

Upon appellants' refusal to transfer their shares, respondents sought an order to show cause re contempt, which the trial court denied, instead ordering respondents to file a motion to confirm the appraiser's award. On February 6, 2001, respondents moved for an order confirming the appraiser's award. Appellants opposed confirmation, arguing "the appraisal erroneously omit[ted] valuation of the corporation's primary assets, the construction and maintenance contracts outstanding as of the valuation date."[2]

On February 26, 2001, appellants submitted the declaration of appraiser Arrighi-Campbell, in which she stated in pertinent part: "The valuation of the shares filed with the court *did not include* the value of the construction contracts or the maintenance contracts of the corporation as of the valuation date, or the profits or losses to be derived therefrom *as the court documents called for liquidation value. . . .*" (Italics added.)

---

[2]Appellants also challenged the omission of workers' compensation and income tax refunds, an issue which appellants have not pursued on this appeal.

On March 21, 2001, while the confirmation motion was pending, the court itself submitted interrogatories to the appraiser, seeking answers to two questions regarding the valuation of the corporation:

"Question 1: In your opinion, what was the liquidation value, as of the May 30, 2000 valuation date, of the unperformed portion of Trahan Brothers, Inc.'s construction contracts, taking into account their terms and conditions, including their provisions for assignability or nonassignability and any other of their terms and conditions which you deem relevant?

"Question 2: What are the estimated future profits/losses not yet earned as of the Valuation Date (May 30, 2000) determined as of the Valuation Date on construction contracts signed on or before the Valuation Date?"

On April 3, 2001, the appraiser responded in a letter to the judge, stating that "[t]he liquidation value as of the May 30, 2000 valuation date for the unperformed portion of Trahan Bros., Inc.'s construction contracts amounts to approximately $271,745, or the profit recognized to date." She stated that although the company had contract backlogs of approximately $3.3 million with a total estimated gross profit of $924,767 as of the valuation date, "assignability or lack thereof is the key factor which drives the value down. The main reason for this devaluation is that the Company would generally not have been able to 'sell' these contracts as there is 1) little or no market for partially completed contracts and 2) on the public works and or bonded work, assignability is generally not allowed. Please note that the anticipated gross profit upon completion of the public works or bonded projects would have amounted to approximately $650,000 of the $924,767 of total estimated gross profit."

In answer to the second question propounded by the court, the letter stated: "The estimated future profits not yet earned as of the valuation date on contracts in progress would have to be estimated at $653,022, based on the work in progress schedule provided by the parties as of May 30, 2000. . . . However there are two important items one must consider 1) the courts [*sic*] originally asked for and received *the liquidation value as of May 30, 2000 which by its terms implies the contracts would not be completed and therefore the above estimate of $653,022 would not come to fruition* and 2) if the contracts were performed through completion by the parties or someone else there would be incidental and overhead costs incurred which are not considered in the $653,022. One would be required to estimate the completion dates of the signed contracts as of May 30, 2000 as well as what the average monthly overhead costs were/are in order to get the net profit which

may positively or negatively affect the equity position of Trahan Bros., Inc." (Italics added.)[3]

On April 19, 2001, the court issued its decision confirming the award of the appraiser. According to the court "the letter satisfied the Court that the Appraiser had taken into consideration the valuation of construction and maintenance contracts, finding their value to be zero for the reasons set forth in the letter." On May 25, 2001, the court filed its decree confirming the award of the appraiser, and ordering as provided in section 2000, subdivision (c), that the corporation be wound up and dissolved unless respondents-purchasing parties pay appellants-moving parties amounts equal to or greater than that determined by the award of the appraiser to be the value of appellants' shares and ordering appellants upon such tender by respondents to immediately effect transfer of their shares in the corporation to respondents. This timely appeal followed.

## DISCUSSION

The issue on appeal is whether the court erred in confirming the award of the appraiser where the appraiser did not take into account the profits, if any, from contracts which had not been completed by the valuation date.

### Standard of Review

█ The trial court's confirmation of the appraiser's report is primarily a factual determination, which must be affirmed if supported by substantial evidence. (*Mart v. Severson* (2002) 95 Cal.App.4th 521 [115 Cal.Rptr.2d 717]; *Brown v. Allied Corrugated Box Co.* (1979) 91 Cal.App.3d 477, 485 [154 Cal.Rptr. 170]; See 2 Marsh, et al., Cal. Corporation Law (4th ed. 2001 supp.) § 21.08[B], pp. 21-42 to 21-44.) However, as we recognized in *Mart v. Severson* "the superior court's interpretation of the statutory standard set forth in section 2000 is subject to de novo review on appeal. [Citations.]" (*Mart*, at p. 530.) Moreover, the substantial evidence rule is inapplicable if the record clearly establishes that improper inferences were drawn from the uncontroverted facts. (*Brown v. Allied Corrugated Box Co., supra*, 91 Cal.App.3d 477.)

Appellants contend the decree must be reversed because the court's confirmation of the appraiser's determination of the fair value of their shares was erroneous as a matter of law.

---

[3]The appraiser's reports are not required to be verified under the statute and the court did not include such a requirement in its instructions. (See *Abrams v. Abrams-Rubaloff & Associates, Inc.* (1980) 114 Cal.App.3d 240, 249 [170 Cal.Rptr. 656].)

*Clearing out the Underbrush.*

At the outset, we point out that appellants never requested that the trial court exercise its discretion to defer the valuation date to allow the backlog of construction and maintenance contracts to be completed. Consequently, appellants cannot and do not here contend the court abused its discretion in setting the valuation date at May 30, 2000, as provided by the statute.

Nor did appellants argue in the court below that there was a possibility of sale of the entire business as a going concern in a liquidation. Appellants do not contend on appeal that the appraiser erred in failing to value the corporation as a going concern in a liquidation. Indeed, appellants specifically disavow any such claim on appeal. Any error in this regard has been explicitly waived by appellants.

Finally, appellants do not here challenge the appraiser's conclusions as to the liquidation value of the corporation absent consideration of the outstanding contracts or as to the value of the contracts, should they be considered.[4]

I.

Appellants contend the appraiser should have determined the fair value of appellants' shares by calculating their investment value using the five methods set forth in Internal Revenue Bulletin, Revenue Ruling 59-60, 1959-1 Cumulative Bulletin 237, and propounded by *Ronald v. 4-C's Electronic Packaging, Inc.* (1985) 168 Cal.App.3d 290 [214 Cal.Rptr. 225] (*Ronald*). *Ronald* opined that the five valuation approaches in combination, "will determine the value of a minority interest in a closely held corporation." (*Ronald*, at p. 299.)[5] (But see 2 Marsh et al., Cal. Corporation Law, *supra*, § 21.08[C], pp. 21-47 to 21-48, criticizing *Ronald* as "confusing" and condemning its use of the factors of Rev. Ruling 59-60, normally used for federal estate tax purposes, to determine market value of the stock of a closely held corporation for buy-out purposes.) Appellants assert that utilization of the various methods set forth in the revenue ruling and *Ronald*, for determining the investment value of closely held shares includes evaluation of the earning capacity of the corporation and that "[p]otential future income

---

[4]Nor would the record support such a challenge. None of the materials relied upon by the appraiser for her conclusions are included in the record. As it is appellants' burden to show error, we must assume that her calculations would be supported by the information supplied to her.

[5]"These valuation approaches, employing all of the factors of Revenue Ruling 59-60, are adjusted net worth, capitalization of income stream, capitalization of earnings before interest and tax, discounted cash flow, and market comparables." (*Ronald, supra,* 168 Cal.App.3d at p. 299.)

is a major factor in many valuations of closely-held stocks . . . ." (Rev. Ruling 59-60, § 4.02(d).) Such calculation would require evaluation of the outstanding contracts as part of the valuing of the potential future income of the corporation.

We reject this claim at the outset. The appraisers in *Ronald* valued that closely held corporation as a going concern in liquidation. Hence, the *Ronald* court's equation of fair value with investment value was premised upon the possibility of selling the entire business as a going concern in liquidation. (*Ronald, supra*, 168 Cal.App.3d at pp. 294, 295, 297-299.) That possibility was ruled out here. Indeed, calculation of investment value is a pointless exercise where there is no possibility the enterprise could be sold as a going concern in liquidation. We therefore reject the claim that the appraiser's failure to determine investment value of the stock by a combination of the five methods set forth in Revenue Ruling 59-60 and *Ronald* was erroneous as a matter of law and we need not address the merits of the critique of that case set forth in the Marsh treatise.

## II.

Appellants further argue the appraisal was flawed as a matter of law because the resulting valuation of their shares was considerably less than they would have received upon actual dissolution of the corporation. Appellants urge that the dissolution process allows for winding up of the corporation, which would have included completion and performance of these outstanding contracts.

Clearly dissolution includes the process of winding up and liquidation. "Neither a voluntary election to dissolve, nor court order for involuntary dissolution, automatically terminates the corporation's existence or its business. Rather, it remains in existence to liquidate and wind up (really, 'wind down'): i.e., to pay or make provision for payment of its debts; to distribute its remaining assets to its shareholders; and to file a certificate of dissolution with the Secretary of State." (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2001) ¶ 8:548, p. 8-97 (Friedman).) Section 2001 empowers the corporation's directors (or other persons appointed to wind up the corporation's affairs) to take all actions reasonably necessary for winding up its affairs, including, without limitation, specific powers to "continue the conduct of the business insofar as necessary for the disposal or winding up thereof" (§ 2001, subd. (b)) and *to "carry out contracts . . ."*

(§ 2001, subd. (c), italics added.)[6] (See Friedman, *supra*, ¶¶ 8:554, 8:555, p. 8-98; 2 Marsh et al., Cal. Corporation Law, *supra*, § 21.09, pp. 21-49 to 21-51.)

 Respondents counter that liquidation is not necessarily the same as dissolution. Although the winding up of a corporation may be part of the dissolution process, it is not a component of the calculation of fair value under section 2000 where the corporation is *not* valued as a going concern in liquidation.

 Section 2000 refers to "liquidation value as of the valuation date." (§ 2000.) Where there is no possible sale of the corporation as a going concern in liquidation, this language necessarily anticipates the piecemeal valuation of the corporation's existing assets and liabilities as of the valuation date, without consideration of any winding-up period. This interpretation of the statute is consistent with case law, which describes liquidation through the sale of the entire business as a going concern in liquidation as the alternative to liquidation through a piecemeal sale of assets.

For example, in *Mart v. Severson, supra,* 95 Cal.App.4th 521, we held the lack of a noncompetition agreement between shareholders did not support the refusal to value the corporation as a going concern. Consequently, *substantial evidence did not support the court's finding the fair value on the valuation date was the corporation's piecemeal liquidation value.* In reaching that conclusion, we observed: "Section 2000 establishes an objective process for valuing a corporation after dissolution proceedings have commenced. The fair value is the liquidation value. But liquidation value can mean going concern value if the corporation could be sold as a going concern in liquidation. Thus, the hypothetical question posed by section 2000 is whether the entire corporation could have been sold as a going concern in liquidation on the valuation date." (*Mart, supra,* at p. 533; see also *Brown v. Allied Corrugated Box Co., supra,* 91 Cal.App.3d 477, 489-490 [liquidation through piecemeal sale of assets versus valuation of assets as a part of a going concern in liquidation]; *Ronald, supra,* 168 Cal.App.3d at p. 297 [a

---

[6]Section 2001 provides in relevant part:

"The powers and duties of the directors (or other persons appointed by the court pursuant to Section 1805) and officers after commencement of a dissolution proceeding include, but are not limited to, the following acts in the name and on behalf of the corporation:

"(a) To elect officers and to employ agents and attorneys to liquidate or wind up its affairs.

"(b) To continue the conduct of the business insofar as necessary for the disposal or winding up thereof.

"(c) *To carry out contracts* and collect, pay, compromise and settle debts and claims for or against the corporation. [¶] . . . [¶]

"(h) In general, to make contracts and to do any and all things in the name of the corporation which may be proper or convenient for the purposes of winding up, settling and liquidating the affairs of the corporation." (Italics added.)

liquidation does not necessarily contemplate piecemeal sale of assets where it may be possible to sell the entire business as a going concern]; *Brown v. Allied Corrugated Box Co., supra,* at p. 490 [same]; Friedman, *supra,* ¶ 8:533, p. 8-93 ["The possibility of selling the business as a going concern must be considered in determining its 'fair value.' [Citations.] [¶] If such a sale is unlikely, the various assets of the business have to be valued piecemeal for liquidation purposes—usually resulting in a distinctly lower value. [Citation.]"].)

■ We are unaware of any case in which liquidation value was found to mean something other than either valuation of the corporation as a going concern in liquidation or the piecemeal valuation of the company's assets and liabilities as of the valuation date. Respondents correctly characterize appellants' challenge to the exclusion from the appraisal of future profits from the outstanding contracts as an attempt to single out one particular class of assets and treat them as if they, alone, constituted a going concern, without regard to their actual value on the valuation date and without regard to the liabilities associated with them or to the profitability of the business as a whole.

Appellants contend that the failure to take into account the likelihood that the outstanding contracts would be completed in dissolution during a winding up period and the consequent failure to include the value of those contracts in the fair value determination undermines the main objective of the statute. That objective was described in *Brown v. Allied Corrugated Box Co., supra,* 91 Cal.App.3d 477: "[T]he object of the appraisal proceedings below should essentially have been to award plaintiffs [sellers] what they would have received had their involuntary dissolution action been allowed to proceed to a successful conclusion. [Citation.]" (*Id.* at p. 489.)

In *Brown v. Allied Corrugated Box Co., supra,* 91 Cal.App.3d 477, the court held, among other things, that under former sections 4658 and 4659 (the predecessor statutes to § 2000), it was improper to discount the value of minority shares being purchased because of their lack of control. The court looked to the statutory buy-out scheme to determine whether minority shares should be discounted, finding the practice of devaluing minority shares in the area of taxation to have little validity in the buy-out context. (*Brown,* at p. 486.) According to the court, "it is clear that upon distribution of the dissolution proceeds each of the shareholders would have been entitled to the exact same amount per share, with no consideration being given to whether the shares had been controlling or noncontrolling. [¶] Under the valuation approach adopted by the majority commissioners and confirmed by the trial court, however, a controlling shareholder, especially an unscrupulous one, could avoid the proportionate distribution which would follow from an involuntary dissolution simply by invoking the buy-out provisions

of former Corporations Code sections 4658 [citation] and 4659 [citation]." (*Id.* at p. 486, fn. omitted.) "Thus, the very misconduct and unfairness which provoked the minority shareholders to seek involuntary dissolution could, in this manner, be used to further oppress them. This, the statutory scheme before us cannot be read as condoning. *Rather, the statutes suggest that a minority shareholder who brings an action for the involuntary dissolution of a corporation should not, by virtue of the controlling shareholder's invocation of the buy-out remedy, receive less than he would have received had the dissolution been allowed to proceed.* The majority commissioners' decision here to devalue plaintiffs' shares for their lack of control was in direct conflict with this principle." (*Id.* at p. 487, fn. omitted, italics added.)

Other cases and commentators have reached similar conclusions as to the objectives of the buy-out provision of section 2000 and its predecessors. (See 2 Marsh et al., Cal. Corporation Law, *supra,* § 21.08[C], p. 21-46 ["The purchase procedure is an alternative to the liquidation requested by the minority, in which obviously all shareholders would participate pro rata in the proceeds of liquidation."]; *Ronald, supra,* 168 Cal.App.3d at p. 297 [While moving parties should not be entitled to more than the liquidation value of the shares, i.e., what they would receive if their objective (dissolution) is obtained, neither should they receive a discounted share value because they do not hold a controlling interest.].)

■ The objective of section 2000 is to provide an alternative to dissolution through a buy-out by the holders of 50 percent or more of the shares of the corporation. The objective of the statutory appraisal process is to find a fair value for the shares of the parties seeking dissolution and to award the 50 percent shareholders seeking dissolution the liquidation value they would have received had their dissolution action been allowed to proceed to a successful conclusion. If the purchasing parties believe the price fixed by the court is too high, they can refuse to purchase the shares at that price and permit the winding up and dissolution of the corporation to proceed. Their only liability would be to pay the expenses (including attorney fees) incurred by the moving parties in the appraisal process. (See § 2000, subd. (c); Friedman, *supra,* ¶ 8.547.1, p. 8-97.) No comparable provision allows moving parties to refuse to accept a share price they believe to be too low.

■ We are thus confronted with a seeming contradiction between the objective of section 2000 and the language of the statute, which provides that "The fair value shall be determined on the basis of *the liquidation value as of the valuation date,* . . ." (§ 2000, subd. (a), italics added.)

We are not persuaded that the liquidation value can never take into account profits and losses associated with winding up the corporation. As we recently recognized, liquidation value encompasses not only the value which

would be received from piecemeal sale of assets, "[b]ut liquidation value can mean going concern value . . . ." (*Mart v. Severson, supra,* 95 Cal.App.4th 521, 533.) Just as the term "liquidation value" is broad enough to include going concern value, the term is also broad enough to encompass the value realized during the winding up period, before liquidation or piecemeal sale of the assets where it is possible to estimate the profits and/or losses ascribable to the winding up period of a dissolution *and where the court sets a valuation date which encompasses such a winding up period.*

This is consistent with the broad definition of the term "liquidation" which has been recognized by our Supreme Court. *Wilson v. Superior Court* (1935) 2 Cal.2d 632 [43 P.2d 286], involved the liquidation of an insolvent building and loan association under the former Building and Loan Association Act.[7] There, in interpreting the powers given to the commissioner under the former act, the court stated: "The petitioner argues for a strict construction, but advances no compelling reasons therefor. The act is designed to accomplish an important and beneficial public service, the liquidation of insolvent associations in the interest of creditors and claimants. The 'liquidation' of a business is the winding up or settling with creditors and debtors [citations], and the term does not have the restricted meaning urged by petitioner, namely, the sale of the assets for cash. The successful achievement of the object of the statute requires broad rather than limited powers, and justifies a liberal rather than a strict construction." (2 Cal.2d at p. 637.) Although in a somewhat different context, *Wilson* is illustrative of the Supreme Court's willingness to look to the statutory objectives in broadly construing the term "liquidation."

Although liquidation may be broadly construed, appellants' interpretation of section 2000 to include the unperformed contracts would effectively read out of the statute the language requiring that the fair value of the shares be determined "as of the valuation date." Here, consistent with section 2000, subdivision (f), the valuation date was set as May 30, 2000, the date appellants executed their election to dissolve the corporation. The statute requires the appraisal determine the liquidation value as of the valuation date and defines that date as the date the dissolution proceeding was initiated. Nevertheless, subdivision (f) provides flexibility by giving the court discretion to designate some other date as the valuation date, upon motion of a party and for good cause. (§ 2000, subd. (f).) Appellants could have requested the court to set the valuation date to allow for a hypothetical winding up period, during which the unperformed contracts would be completed and the profits realized. Such request would appear particularly

[7](1 Deering's Gen. Laws, 1931, Act 986, p. 460, as amended in 1933 (Deering's 1933 supp.) p. 1199.)

appropriate in the case of service corporations, whose main assets are contracts to be performed in the future. Appellants did not make such a request, apparently under the belief that by setting a valuation date in the future, they would be forced to defer the appraisal and sale of their shares until that valuation and would in the meantime be forced to continue in what appellants believed to be an untenable situation.[8]

Had the court set a deferred valuation date upon appellants' request and a showing of good cause therefor, the parties still could have engaged in and concluded the section 2000 process promptly. The appraisal and the actual purchase of appellants' shares could have occurred in the section 2000 proceeding, well before the valuation date. The liquidation value of the assets could have been determined based upon the appraiser's projection as to what that value would be on the valuation date, after performance of the contracts. Upon court confirmation of the appraisal, respondents could immediately purchase appellants' shares for their designated fair value or could choose to allow the dissolution to proceed.

It is true that the more an appraisal looks toward future events, such as the hypothetical winding up of the corporation, the more speculative the appraisal becomes. However, respondents-purchasing parties are protected insofar as they can refuse to purchase the shares at the value determined by the appraiser and confirmed by the court. If respondents believe the shares are overvalued they can allow the dissolution to proceed.

Moreover, the valuation of shares in buy-out situations such as this often involves not only estimates, but assumptions based upon hypothetical scenarios which may in fact not occur. Indeed, the valuation of a corporation as a "going concern in liquidation" is based upon an assumption that a willing buyer could be or could have been found for such a sale on the valuation date. In *Mart v. Severson, supra,* 95 Cal.App.4th 521, we supported the use of a hypothetical sale model in order to conduct a section 2000 fair value analysis. We acknowledged that the question of whether liquidation value could mean going concern value rested upon hypothetical considerations:

---

[8]To date courts have not addressed the question whether in a piecemeal liquidation situation such as this, a party must wait until the actual valuation date set under section 2000, subdivision (f) to invoke the appraisal and buy-out provisions of section 2000. Nor does the legislative history of the amendment adding the alternate valuation date language to section 2000, subdivision (f) shed light upon this issue. However, the discretion given the court by the express language of subdivision (f) to designate a valuation date other than the date upon which the dissolution proceeding was initiated encompasses the possibility that the court may obtain a current appraisal of the fair value of the shares based on a future valuation date, such as following a hypothetical winding up period. Moreover, this interpretation of the alternate valuation date provision of subdivision (f) facilitates the purpose of the statutory scheme, which is to expedite the buy-out procedure in cases of shareholder deadlock.

"To answer that question, the appraisers considered hypothetical reasonable sellers, hypothetical reasonable buyers, and a hypothetical forced sale liquidation environment." (*Mart*, 95 Cal.App.4th, at p. 533.) Even evidence that one party would not act according to these assumptions by signing a covenant not to compete was not relevant to the hypothetical scenario the appraisers were to consider. (*Ibid.*) "[W]hen making a section 2000 fair value determination, appraisers should always assume a hypothetical seller's covenant not to compete just as they should assume that the parties to the hypothetical sale will negotiate the other requisite terms to a sales agreement. Indeed, without these assumptions, it would be impossible to construct a hypothetical sale pursuant to which a fair value could be determined." (*Id.* at p. 534; see also *Abrams v. Abrams-Rubaloff & Associates., Inc., supra,* 114 Cal.App.3d 240, 249; Friedman, *supra,* ¶ 8:534, p. 8-93.)

■ We recognize that as with a corporate dissolution, the section 2000 buy-out procedure is subject to equitable limitations. (Cf. *In re Security Finance Co.* (1957) 49 Cal.2d 370, 376-377 [317 P.2d 1].)[9] ■ The result here may seem unfair insofar as the pending contracts which might yield a considerable profit upon completion were not included in the determination of the corporation's liquidation value. However, we cannot ignore the express language of the statute. Unfortunately, the result here is compelled by the interaction of the appraiser's unchallenged determination that the corporation could not be sold as a going concern in liquidation and the designation of May 30, 2000, as the valuation date. Appellants could have challenged the appraiser's failure to value the corporation as a going concern in liquidation and urged the court to consider evaluation of the corporation as a going concern in liquidation. Appellants also could have requested that the court set a valuation date which would take into account a hypothetical winding up period to allow the completion of the contracts. They did neither. In these circumstances we are compelled to conclude that substantial evidence supports the court's confirmation of the appraiser's determination of the fair value of the Trahan Bros., Inc., shares as the value upon piecemeal sale of the assets as of May 30, 3000.

---

[9]In *In re Security Finance Co., supra,* 49 Cal.2d 370, the California Supreme Court recognized the application of equitable limitations to the dissolution process. The court observed that shareholders representing 50 percent of the voting power who had the right to initiate voluntary winding up and dissolution pursuant to former section 4600 "do not have an absolute right under section 4600 to dissolve a corporation. Thus, they have no right to dissolve a corporation to defraud the other shareholders [citation], to 'freeze out' minority shareholders [citation], or to sell the assets of the dissolved corporation at an inadequate price. [Citation.] . . . [¶] There is nothing sacred in the life of a corporation that transcends the interests of its shareholders, but because dissolution falls with such finality on those interests, above all corporate powers it is subject to equitable limitations. [Citation.]" (*In re Security Finance Co., supra,* at pp. 376-377.)

## DISPOSITION

The decree is affirmed. Costs on appeal are awarded to respondents.

Lambden, J., and Ruvolo, J., concurred.

A petition for a rehearing was denied July 8, 2002.