Filed 8/24/21  Pourmoradi v. Gabbai CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JOHN POURMORADI, et al., | B301009 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. VC066389) |
| v. | |
| BEHRUZ GABBAI, et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Brian F. Gasdia, Judge.  Reversed and remanded with instructions.

Russ, August & Kabat, Matthew A. Rips and Nathan D. Meyer, for Defendants and Appellants.

Buchalter, Michael L. Wachtell, Efrat M. Cogan, and David E. Mark, for Plaintiff and Respondent John Pourmoradi.

Greenberg Traurig, Frank E. Merideth, Jr., for Plaintiff and Respondent Andrea Pourmoradi.

# I.    INTRODUCTION

Plaintiffs,[1] owners of a 50 percent membership interest in a limited liability company, filed an action under Corporations Code section 17707.03[2] for judicial dissolution of the company. Defendants,[3] who owned the other 50 percent interest, sought to avoid dissolution by exercising their statutory right to purchase plaintiffs' interest for fair market value.  Following the required appraisal process, the trial court ascertained and fixed the value of plaintiffs' interest and entered an alternative decree that ordered:  (1) defendants to buy plaintiffs' interest for the appraised value, but without the recommended reduction for lack of control or marketability; or, in the alternative, (2) the immediate dissolution of the company.

On appeal, defendants contend that the trial court erred by applying a "fair value" standard—instead of the required "fair market value" standard—to fix the purchase price of plaintiffs' interest.  We conclude the court abused its discretion by applying the wrong statutory valuation standard.  We therefore reverse the alternative decree and remand with instructions.

---

[1]    Plaintiffs are John and Andrea Pourmoradi, as trustees for the Pourmoradi Family Trust (Pourmoradi trust).  When we refer to them individually, we use plaintiffs' first names for clarity.

[2]    All further statutory references are to the Corporations Code, unless otherwise indicated.

[3]    Defendants are Behruz and Katherine Morovati Gabbai, as trustees for the Gabbai revocable Family Trust (Gabbai trust).

2

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *2801 East Vernon LLC*

On November 27, 2009, the Pourmoradi trust and the Gabbai trust formed 2801 East Vernon LLC (the company), a California limited liability company (LLC).  The trusts each owned an undivided 50 percent interest in the company.  The primary asset of the company was a parcel of commercial real property in Vernon which included a 102,000 square foot warehouse with a showroom and office space.

Pursuant to the company's operating agreement, Behruz Gabbai and John were appointed as the managers of the company.  The agreement provided that disputes regarding management of the company could only be resolved by a majority of the managers.  It also required that any actions of the company, including dissolution, required a majority vote of the members.

### B.    *Judicial Dissolution Action*

In June 2017, the management and membership of the company became deadlocked over whether to restructure a secured loan or sell the property.  After the parties were unable to reach an agreement on the price for defendants' purchase of plaintiffs' interest, plaintiffs filed on June 29, 2017, an action to dissolve the company and appoint a receiver to wind up its affairs.

C.    *Application to Stay and Value Membership Interest*

On October 10, 2017, defendants filed an application for an order staying the dissolution proceeding and ascertaining the value of plaintiffs' membership interest in the company pursuant to section 17707.03, subdivision (c).[4]

Following certain stipulations, applications, and orders concerning the appointment of two party-nominated-appraisers and a neutral appraiser, the trial court, on March 7, 2018, entered an order appointing a plaintiffs' appraiser, a defendants' appraiser, and a neutral appraiser. The order provided that the appraisers were "charged to appraise the fair market value of the membership interest owned by [p]laintiffs pursuant to [section] 17707.03[, subdivision] (c) . . . ."

D.    *Initial Appraisers' Report*

On April 4, 2018, the appraisers submitted a three-page summary report that attached, among other documents, the appraisals of the neutral appraiser and defendants' appraiser.[5]

---

[4]    As explained below, under section 17707.03, subdivision (c)(1), when a member of an LLC moves to dissolve the company, a nonmoving member may avoid dissolution by electing to purchase the moving member's interest for fair market value. Under subdivision (c)(2), the purchasing party may request an order staying the proceeding and fixing the purchase price of the moving member's interest.

[5]    Plaintiffs' appraiser did not submit a separate appraisal of plaintiffs' membership interest in the company. He did, however, submit a joint summary report, along with the two other

According to the summary, all three appraisers agreed that the market value of the real property owned by the company on the valuation date of June 29, 2017, was $14,400,000. But the appraisers could not agree on a definition of the term "fair market value" as used in section 17707.03. Plaintiffs' attorneys advised the appraisers that the term "fair market value" was the equivalent of the term "fair value" used in section 2000[6] for corporate dissolutions. Defendants' attorneys opined that the definition of "fair market value" was as set forth in IRS Revenue Ruling 59-60[7] and the American Society of Appraisers (ASA) Business Valuation Standards.[8]

---

appraisers, concerning the market value of the real property itself. That separate valuation was accepted and used by defendants' appraiser and the neutral appraiser to determine the fair market value of plaintiffs' membership interest.

[6] As explained below, under section 2000 the "fair value" of a minority shareholder's interest in a corporation is determined on the basis of the liquidation value of the shareholders' interest as of the valuation date, taking into account the possibility of a sale of the entire business as a going concern in a liquidation.

[7] According to the report, IRS Revenue Ruling 59-60 defined fair market value as: "The price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."

[8] According to the report, the ASA Business Valuation Standards defined fair market value as: "The price, expressed in terms of cash equivalents, at which the property would change hands between a hypothetical willing and able buyer and a

The report therefore used both parties' definitions, and all three appraisers agreed that the fair value of plaintiffs' interest in the company was $4,989,000.  But they disagreed on the fair market value.  Defendants' appraiser concluded that the fair market value was $4,030,000, applying a lack of control discount of 10 percent and a lack of marketability discount of 15 percent.  The neutral appraiser concluded that the fair market value was $4,223,000, applying a combined lack of control and marketability discount of 20 percent.

E.     *Hearing and Order on Initial Report*

Following the appraisers' initial report, defendants filed a brief, arguing that the trial court should adopt defendants' fair market value appraisal and reject the fair value appraisal because it ignored and altered the applicable statutory language of section 17707.03.  In their brief, plaintiffs argued that because the appraisers disagreed as to the fair market value of plaintiffs' interest, the court should reject their report, take further evidence, and decide the valuation question de novo.  Plaintiffs also maintained that the control and marketability discounts were not warranted, arguing that there was no reason to treat LLC dissolutions under section 17707.03 differently from corporate dissolutions under section 2000, particularly when the interest involved was a 50 percent interest.  Plaintiffs supported their position with an expert declaration from Daniel

hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts."

6

McConaughy who disputed, among other things, the factual basis for the lack of control and marketability discounts used by defendants' appraiser and the neutral appraiser. Plaintiffs also separately moved to change the valuation date.

Following further briefing, the trial court held a hearing and issued a minute order that denied plaintiffs' request to change the valuation date and remanded the matter to the appraisers for a new valuation using the definition of fair market value applied in eminent domain proceedings under Code of Civil Procedure section 1263.320.[9] The court further instructed the appraisers to attempt to agree on a unanimous appraisal and advised that, in the event they could not arrive at one, the court would either choose from among the conflicting appraisals or decide the matter de novo.

F.    *Unanimous Report*

On August 10, 2018, the appraisers submitted a unanimous report on the value of plaintiffs' membership interest. According

---

[9]    Code of Civil Procedure section 1263.320 provides: "(a) The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available. [¶] (b) The fair market value of property taken for which there is no relevant, comparable market is its value on the date of valuation as determined by any method of valuation that is just and equitable."

7

to the appraisers, they used the definition of fair market value provided by the trial court and the fair value definition in section 2000. The appraisers calculated the net asset value of the company to be $10,557,729 and the fair market value of plaintiffs' interest in the company to be $4,487,000. In reaching that conclusion, the appraisers explained that they applied a 15 percent discount—to account for lack of control and marketability—to reduce plaintiffs' proportionate 50 percent share of the net asset value of the company.

The appraisers also concluded that the fair value of the plaintiffs' interest, under the definition set forth at section 2000, was $4,989,000. In calculating fair value, the appraisers applied a 5.5 percent discount—to account for estimated liquidation costs—to reduce plaintiffs' proportionate 50 percent share of the net asset value of the company.

G.    *Hearing and Ruling*

On August 21, 2018, defendants moved to confirm the appraisal in the unanimous report, arguing that because there was no bona fide dispute remaining in the action, the trial court should accept and confirm the report. Defendants requested that the trial court issue an order and alternative decree that the value of plaintiffs' interest in the company was $4,487,000.

Andrea objected to the unanimous report and moved to strike it, arguing that the appraisers failed to follow the trial court's definition of fair market value as found in Code of Civil Procedure section 1263.320. Citing to the attached expert declaration of Bradford Thompson, Andrea also contended that there was an insufficient factual basis to support the lack of

8

control and marketability discounts.  As Bradford explained, in his 29 years of appraisal practice, he had never seen lack of control and marketability discounts applied in eminent domain cases.

In his opening brief, John contended that, because there was no comparable market for plaintiffs' interest, justice and equity dictated that each member of the company receive its 50 percent proportionate share of the net asset value of the company, without any valuation discounts or other factually unjustified reductions.  Citing to an attached supplemental expert declaration of McConaughy, John also complained that the appraisers applied a discounted cash flow analysis to their valuation that was inapplicable under the circumstances.  And, John reiterated based on McConaughy's original and supplemental declarations that the lack of control and marketability discounts were factually unsupported in this case.

Following the initial round of briefing, the parties submitted further briefing and objections.  On January 24, 2019, the trial court held a hearing on the report and took the matter under submission.

On March 28, 2019, the trial court issued a minute order approving the unanimous report, except for the 15 percent discount for lack of control and marketability.  According to the court, "[w]hile the 15 [percent] reduction for [lack of control and marketability] arguably appears justified from an accounting standpoint (although the agreed and accepted compromise reduction of 15 [percent] is really without further explanation), the court finds controlling the logic and holding set forth by the [a]ppellate [c]ourt in [*Brown v. Allied Corrugated Box Co., Inc.*] (1979) 91 Cal.App.3d 477 [(*Brown*)].  . . .  [¶  . . .  ¶]  [H]ere the

9

[company] is made up of only two partners.  The sale of one partner's interest to the other partner would give the purchasing partner total control over the entire company.  As such, a reduction for lack of control or lack of marketability would serve no purpose under this scenario.  Such a reduction would only make sense if [plaintiffs were] selling [their] shares to some third[-]party purchaser who lacked control over the business affairs of [the company].  [¶]  Accordingly, this court declines to apply the 15 [percent] reduction in value for [lack of control and marketability].  In fixing and setting the amount in the alternative decree, the court finds . . . the purchase amount . . . to be $5,278,865.00 [plaintiffs' 50 percent share of the net asset value of the company] . . . , without any percentage reduction therefrom.  All other analyses, calculations, and conclusions of the unanimous [report] are well thought out and supported by the extensive research of the appraisers, and except as noted herein, are hereby approved without further offset, reduction or alteration."

On July 25, 2019, the trial court entered an alternative decree that ordered defendants to pay plaintiffs, within 120 days, $5,278,865 "representing one-half of the [c]ompany's net asset value as of [the] June 29, 2017[, valuation date]."[10]  The decree provided that if payment was not fully and timely made, the company would be dissolved and wound up.

---

[10]    The decree also ordered defendants, within 120 days, to pay plaintiffs $1.8 million as reimbursement for certain post-valuation date capital contributions, unless a different agreement for reimbursement could be made within that time.

On September 23, 2019, defendants filed a timely notice of appeal from the alternative decree.[11]

## III. DISCUSSION

### A. *Standard of Review*

We review questions of statutory interpretation under a de novo standard of review. (*United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1089; see also *Goles v. Sawhney* (2016) 5 Cal.App.5th 1014, 1018 [the factual aspects of the fair value determination are reviewed under the substantial evidence standard, but trial court's "'interpretation of the statutory standard set forth in section 2000 is subject to de novo review on appeal'"].) Challenges to a trial court's valuation of property, including a court's acceptance or rejection of expert valuation testimony, are generally reviewed for abuse of discretion. (See *In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 197; *People ex rel. Dept. of Transportation v. Clauser/Wells Partenrship* (2002) 95 Cal.App.4th 1066, 1073.) A court abuses its discretion when it applies the wrong legal standard. (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733.)

---

[11] Plaintiffs each filed notices of cross-appeal, but those appeals were abandoned and dismissed.

B.      *Statutory Scheme Governing Dissolutions*

   1.      Fair Value Under Section 2000

        Effective January 1, 1977, the Legislature enacted section 2000 which deals with actions for the involuntary dissolution of corporations and the right of majority shareholders' to avoid dissolution.  Subdivision (a) provides, in pertinent part:  "In any suit for involuntary dissolution, or in any proceeding for voluntary dissolution initiated by the vote of shareholders representing only 50 percent of the voting power, the corporation or, if it does not elect to purchase, the holders of 50 percent or more of the voting power of the corporation (the 'purchasing parties') may avoid the dissolution of the corporation and the appointment of any receiver by purchasing for cash the shares owned by the plaintiffs or by the shareholders so initiating the proceeding (the 'moving parties') at their *fair value.*  [¶]  The *fair value* shall be determined on the basis of *the liquidation value* as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation."  (§ 2000, subd. (a), italics added.)

        In *Trahan v. Trahan* (2002) 99 Cal.App.4th 62 (*Trahan*), the court explained the valuation process under section 2000 as follows:  "The objective of section 2000 is to provide an alternative to dissolution through a [buyout] by the holders of 50 percent or more of the shares of the corporation.  The objective of the statutory appraisal process is to find a fair value for the shares of the parties seeking dissolution and to award the 50 percent shareholders seeking dissolution the liquidation value they would have received had their dissolution action been allowed to

12

proceed to a successful conclusion.  If the purchasing parties
believe the price fixed by the court is too high, they can refuse to
purchase the shares at that price and permit the winding up and
dissolution of the corporation to proceed.  Their only liability
would be to pay the expenses (including attorney fees) incurred
by the moving parties in the appraisal process.  (See § 2000,
subd. (c); [citation].)  No comparable provision allows moving
parties to refuse to accept a share price they believe to be too
low." (*Trahan, supra*, 99 Cal.App.4th at p. 75.)

As the court in *Trahan, supra*, 99 Cal.App.4th 62 noted,
under the fair value standard of section 2000, valuation discounts
for market factors, such as lack of control, are not permitted.  "In
*Brown*[*, supra*, 91 Cal.App.3d 477], the court held, among other
things, that under former sections 4658 and 4659 (the
predecessor statutes to [section] 2000), it was improper to
discount the value of minority shares being purchased because of
their lack of control.  The court looked to the statutory [buyout]
scheme to determine whether minority shares should be
discounted, finding the practice of devaluing minority shares in
the area of taxation to have little validity in the [buyout] context.
([*Brown, supra*, 91 Cal.App.3d] at p. 486.)  According to the court,
'it is clear that upon distribution of the dissolution proceeds each
of the shareholders would have been entitled to the exact same
amount per share, with no consideration being given to whether
the shares had been controlling or noncontrolling. . . .' (*Id.* at
p. 486, fn. omitted.) . . . '[*T*]*he statutes suggest that a minority
shareholder who brings an action for the involuntary dissolution
of a corporation should not, by virtue of the controlling
shareholder's invocation of the* [*buyout*] *remedy, receive less than*

13

*he would have received had the dissolution been allowed to proceed.'"* (*Trahan, supra*, 99 Cal.App.4th at pp. 74–75.)

      2.    <u>Fair Market Value Under Section 17707.03</u>

"The Legislature enacted the Beverly-Killea Limited Liability Company Act (the Act) in 1994.  ([ ] § 17000 et seq.)  "'A limited liability company is a hybrid business entity formed under the Corporations Code . . . [which] provides members with limited liability to the same extent enjoyed by corporate shareholders [citation] . . .[ ]'" (*PacLink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 963 . . .) while maintaining the attributes of a partnership for federal income tax purposes.  [Citation.]" (*People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1211–1212.)

In 1994, the Act included a provision, former section 17351—dealing with LLC dissolutions and a nonmoving member's buyout rights—that was apparently modeled on section 2000.  (*Ontiveros v. Constable* (2018) 27 Cal.App.5th 259, 269, fn. 6; see *Dickson v. Rehmke* (2008) 164 Cal.App.4th 469, 474–475 and fn. 2 (*Dickson*).)  There were, however, two significant differences between the two provisions.  Instead of using the term "fair value" from section 2000, former section 17351 substituted the term "fair market value." (See *Dickson, supra*, 164 Cal.App.4th at pp. 474–475.)  And, the section 2000 definition of fair value—the liquidation value on the date of valuation—was omitted from section 17351, without providing an alternative definition.

Effective January 1, 2014, the Legislature amended the Act, and former section 17351 was repealed and replaced with

14

current section 17707.03 without substantive change.[12] (*Ontiveros, supra*, 27 Cal.App.5th at p. 269, fn. 6.) Specifically, section 17707.03 continued to use the term "fair market value" throughout and continued to omit the section 2000 reference to the liquidation value of the interest being purchased or any other definition of "fair market value."

C.    *Analysis*

Defendants contend that the trial court failed to correctly apply the "fair market value" standard for valuation and instead applied the "fair value" standard set forth at section 2000. Plaintiffs counter that that the court correctly applied the "fair market value" standard for valuation, which, in their view, is

---

[12]    Subdivisions (a) and (b) of section 17707.03 state that when, as here, the management of an LLC is deadlocked, any manager or member may move to dissolve the company. Subdivision (c) provides:  "(1)  In any suit for judicial dissolution, the other members may avoid the dissolution of the limited liability company by purchasing for cash the membership interests owned by the members so initiating the proceeding, the 'moving parties,' at their *fair market value. . . .* [¶]  (2)  If the purchasing parties elect to purchase the membership interests owned by the moving parties [and] are unable to agree with the moving parties upon the *fair market value* of the membership interests, . . . the court, upon application of the purchasing parties, either in the pending action or in a proceeding initiated in the superior court of the proper county by the purchasing parties, shall stay the winding up and dissolution proceeding and shall proceed to ascertain and fix the *fair market value* of the membership interests owned by the moving parties." (Italics added.)

"materially indistinguishable" from the "fair value" standard. In our view, defendants have the better argument.

We presume that when the Legislature used the term "fair market value" in the Act, rather than "fair value" from section 2000, it intended to change that standard of valuation for LLC dissolutions. We also presume that, by omitting any reference to the liquidation value of the interest being purchased, the Legislature intended a new definition for the term "fair market value," which differed from the liquidation value. (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 461 ["We presume the Legislature intends to change the meaning of a law when it alters the statutory language [citation], as for example when it deletes express provisions of the prior version [citation]"].) Finally, we presume that the Legislature was aware of prior judicial constructions of the term "fair value," as precluding valuation discounts for lack of control. (*Id.* at p. 461–462 ["Because the Legislature is presumed aware of prior judicial constructions of a statute, the inference of altered intent is particularly compelling when . . . the omitted word or phrase was significant to such a construction"]; see *Trahan, supra*, 99 Cal.App.4th at pp. 74–75.) Thus, it follows that the Legislature, in enacting former section 17351, intended to depart from the "fair value" standard and its liquidation value definition and utilize instead a market-based definition that included valuation discounts based on the amount a hypothetical willing and able buyer would pay for the interest in the marketplace.[13]

---

[13] As one commentator has explained, "fair value" and "fair market value" are terms of art to valuation experts and can result in valuations that are materially different based on the inclusion of valuation discounts under the latter standard.

16

We next consider whether the trial court correctly applied the "fair market value" standard of valuation. The court's ruling demonstrates that despite its recitation of a definition of "fair market value" that articulated a market-based approach to valuation, it applied the incorrect "fair value" standard set forth at section 2000.[14] Indeed, aside from the reduction in value for lack of control and marketability, the court expressly adopted the appraisers' valuation of the net assets of the company. Nonetheless, it ultimately valued plaintiffs' interest in the company based solely on the net value of its assets, with no discount for market factors. In other words, the court awarded plaintiffs the amount they would have realized if the company's assets were sold off, after paying off the outstanding loan balance, which reflects an application of the "fair value" standard as defined by cases such as *Brown, supra*, 91 Cal.App.3d 477. Moreover, in explaining that it would not apply a reduction in

---

(Barber, *Are Valuation Discounts Appropriate in LLC Member Statutory Buyouts?* St. Bar Cal. Bus. Law News, at p. 18.) The record of the appraisal process in this case confirms that the three appointed experts understood the two terms of art to be different.

[14] Plaintiffs contend that defendants waived their arguments on appeal because they failed to challenge the trial court's order defining fair market value for the appraisers and failed to fully summarize the evidence in their appellate brief. Defendants, however, do not challenge the court's recitation of the definition of fair market value, but instead contend that the court failed to apply its own definition. Therefore, they did not waive their argument on appeal. Further, we decline to find waiver based on any purported inadequacies in defendants' statement of facts on appeal.

17

value for lack of control and marketability, the court observed that "[s]uch a reduction would only make sense if [plaintiffs were] selling their shares to some third[-]party purchaser." By refusing to consider how much "some third[-]party purchaser" would pay for plaintiffs' interest, the court declined to apply the fair market value standard, which is based on the hypothetical willing and able buyer, and not the actual buyers in this instance, defendants. Finally, the court's statement that its valuation was *controlled* by the "logic and holding" of *Brown*, *supra*, 91 Cal.App.3d 477—which was based solely on section 2000 and the well-established fair value standard—further supports our conclusion that it applied the wrong legal standard.

By awarding, in essence, the liquidation value of plaintiffs' interest, the trial court ignored the Legislature's command to use a market-based standard and instead focused on the relationship of the parties to the dissolution proceeding. The court therefore defaulted to the wrong statutory valuation standard, even if it did not expressly acknowledge that it was utilizing that standard. Because its valuation was based on an incorrect legal standard, and therefore contrary to the intent of the Legislature in redefining the extent of the court's valuation discretion, the alternative decree must be reversed and remanded for further proceedings consistent with this opinion.

In reaching this conclusion, we do not suggest that the court was required to adopt the unanimous appraisers' report in determining the value of plaintiffs' interest in the company.[15]

---

[15] We observe, however, that the court expressly adopted the unanimous appraisers' valuation of the net assets of the company. Further, we do not interpret section 17701.07 to confer on the trial court broad equitable discretion to ignore the plain

18

We conclude only that the court abused its discretion by using the wrong legal standard in calculating that value.

## IV.   DISPOSITION

The alternative decree is reversed and the matter is remanded with instructions to enter a new decree based on the controlling fair market value standard.  Defendants are awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

I concur:

RUBIN, P. J.

---

meaning of the "fair market value" language chosen by the Legislature and substitute instead its own notions of fairness under the circumstances of this case.  Nor do we read that section as an invitation for courts to rewrite the valuation standard applicable in section 17707.03, subdivision (c) dissolution proceedings.

19

John Pourmoradi et al. v. Behruz Gabbai et al.
B301009


BAKER, J., Dissenting



It is a rare thing—maybe even an unprecedented thing—for this court to reverse a trial court ruling on the theory that the court did something that it expressly said it was not doing. But that is where we are, it seems. I respectfully decline to be part of such an enterprise. For reasons I will go on to outline, I believe the trial court's approach in this case was thoughtful, sensible, and within its discretion.


I

Corporations Code sections 17707.01 and 17707.03 permit a member of a limited liability company to file an action for judicial dissolution of the company for various reasons, including internal dissention among management.[1] Section 17707.03 permits the non-suing managing member (or members) to avoid dissolution of the company by buying out the interest of the suing member for "fair market value." (§ 17707.03, subd. (c).) When managing members disagree on what constitutes fair market value, the court must decide the valuation after receiving opinions from a panel of appraisers. (§ 17707.03, subd. (c)(3).)

---

[1] Undesignated statutory references that follow are to the Corporations Code.

Limited liability companies exist with all manner of management structures and differing numbers of managing members. The problem in this case arises because there are only two managing members with equal control of the company in question, 2801 East Vernon LLC. More specifically, the key issue is whether the "fair market value" of the Pourmoradi parties' interest should include some "discount" because, in theory, a market participant buying the Pourmoradi parties' share would not have control of the company; instead, the buyer would in theory have only the 50 percent share purchased—not enough to take action alone when the other 50 percent owner disagrees.

That, however, is an entirely artificial manner of analysis in the case of an equal-share, two-member-controlled company that is the subject of a section 17707.03, subdivision (c) proceeding: a successful section 17707.03, subdivision (c) purchaser in that scenario will end up with 100 percent control of the company. There is no legal or practical justification for applying a lack of control or marketability discount in that circumstance. Indeed, if such a discount were applied, that would allow the purchaser to reap a windfall: the buyer need only pay the court-ordered, discounted price to obtain full control of the company and then, once in possession of full control and the premium it is worth, immediately turn around and sell the company to a third party at a higher price—laughing all the way to the bank to pocket the difference.

The trial court understood that makes no good sense. As I read the record, the court believed some consideration of the equities was necessary to avoid an outcome in this particular factual scenario that the Legislature may not have foreseen but could not have intended. That is exactly right, and the

2

Corporations Code grants a trial court equitable discretion to do just that. (§ 17701.07, subd. (b) ["Unless displaced by particular provisions of this title [i.e., Title 2.6, the California Revised Uniform Limited Liability Company Act], the principles of law and equity supplement this title"]; cf. *Ex parte Ellis* (1858) 11 Cal. 222, 225 ["[I]t is impossible for the Legislature to enter into immensity of detail. It can only make laws in a general manner, and in applying their acts to particular cases, the construction ought to be conformable to the intention of the Legislature. It cannot be presumed that the Legislature intended anything absurd"].) I would affirm on that basis.[2]

## II

Why then does the majority reverse? Not because the majority disputes my assessment of the equities or the prospect of a nearly seven-figure windfall for the Gabbai parties. It comes

---

[2]     The majority says it "does not interpret section 17701.07 to confer on the trial court broad equitable discretion to ignore the plain meaning of the 'fair market value' language chosen by the Legislature and substitute instead its own notions of fairness under the circumstances of this case." The rejoinder to that (besides disregarding the "broad" and "ignore" rhetorical flourishes) is obvious: why not? The majority does not say, and I believe the purpose and applicability of section 17701.07 is plain in a case like this. There is no good policy reason why the Legislature would have wanted a lack of control discount to apply in a scenario like this one (as opposed to scenarios posing no issue of purchased consolidated control). The problem is simply that the Legislature could not have anticipated every factual scenario that might arise—and that is the reason for the supplemental equitable discretion the Legislature itself conferred on courts via section 17701.07.

down to one thing, really: the majority believes the trial court cited the wrong case when articulating its reason for declining to apply a lack of control discount.

Indisputably, the trial court stated the legal standard governing its valuation was the fair market value standard. That is the standard referenced in the "Legal Standard" section at the outset of the court's written ruling, the court's ruling defines the concept of fair market value—a definition no one contends is erroneous, and the court's ruling confirms all of the selected appraisers were ordered to determine the fair market value of the Pourmoradi parties' interest in the company. The sticking point for the majority, though, is that later in its ruling when explaining why there should be no lack of control discount, the trial court cited *Brown v. Allied Corrugated Box Co. Inc.* (1979) 91 Cal.App.3d 477 (*Brown*). The majority believes that citation betrays the trial court's sub silentio use of a different legal standard: a "fair value" standard (§ 2000) that it believes inapplicable. In my view, however, the trial court's citation to *Brown* is understandable and unobjectionable because, in one factual respect, the case is remarkably similar to this one.

In *Brown*, there were four owners of a closely held corporation: two minority shareholders that held a 49 percent stake and two other shareholders that held the remaining 51 percent. (*Brown, supra*, 91 Cal.App.3d at 479-480.) The minority shareholders filed a dissolution complaint, and the trial court adopted a valuation of their ownership share that included a discount because a purchaser of that share would be obtaining less than a controlling interest in the corporation. (*Id.* at 481, 484.) On appeal, the minority shareholders argued this was error and the Court of Appeal agreed. Specifically, the Court of Appeal

4

explained (and this was the only portion of the opinion quoted in the trial court's ruling here): "As a practical matter, there is no question but that the lack of control inherent in plaintiffs' minority shares would substantially decrease their value if they were placed on the open market. In fact, it appears to be the practice in the area of taxation to devalue minority shares in closely held corporations for just this reason. [Citation.] [¶] It has been noted, however, that the rule justifying the devaluation of minority shares in closely held corporations for their lack of control has little validity when the shares are to be purchased by someone who is already in control of the corporation. In such a situation, it can hardly be said that the shares are worth less to the purchaser because they are noncontrolling." (*Id*. at 485-486.)

Courts (including this one) often find support in appellate opinions even when they are not perfect analogs or every point of law discussed in the opinion is not apt. That, in my view, is what the trial court did here: the court seized on a factually similar discussion to buttress its own logic in declining to apply a lack of control discount. That does not mean the court secretly applied the Corporations Code statute at issue in *Brown* as the legal standard that applies here. It just means that, without a better directly controlling case to cite, the court made do with what was available. I remain convinced the trial court applied the correct legal standard, albeit tailored to the equities in the specific case before it. That is what we expect courts to do.

III

In the end, the actual impact, if any, of today's decision is uncertain. The majority does not remand with directions to apply a lack of control discount or to fix a particular company

5

valuation. Instead, the majority remands with only vague "instructions to enter a new decree based on the controlling fair market value standard." Because the majority reverses while at the same time declining to tell the trial court precisely what it must do—or what must be redone—I read the court's disposition to require the trial court to start from scratch: direct the same panel of appraisers or a new panel to prepare updated appraisal reports (time alone may have changed the valuation), consider the revised reporting, and then exercise its own valuation prerogative when deciding whether to confirm the appraisers' recommended award. If the court ends up with the same valuation at issue in this appeal (or close to it) after that process, nothing in the court's disposition forbids it.

BAKER, J.